GATTIS v. KILGO.

(Filed May 30, 1901.)

1. LIBEL AND SLANDER—*Privileged Communications—Questions for Court.*

   Whether a speech by the president of a college, made during an investigation of charges against him, is a privileged communication, is a question of law.

2. LIBEL AND SLANDER—*Malice—Privileged Communications.*

   That one who publishes a privileged communication is indifferent to the consequences, does not show malice.

3. LIBEL AND SLANDER—*Qualified Privilege.*

   This case was properly tried as one of qualified privilege.

4. LIBEL AND SLANDER—*Malice—Qualified Privilege—Instructions—Privileged Communications.*

   The instruction in this case was correct as to malice in communications qualifiedly privileged.

5. LIBEL AND SLANDER—*Privileged Comunications—Malice—Burden of Proof.*

   Where a qualifiedly privileged publication is admitted by defendant, the burden of proof is on the plaintiff to show malice in the publication.

GATTIS *v.* KILGO.

6. LIBEL AND SLANDER—*Malice.*

It is not necessary that malice of defendant should be against the plaintiff personally, but malice will be inferred if the publication is not made in good faith.

7. LIBEL AND SLANDER—*Privileged Communications.*

Where charges are brought against a college president his defense of himself before the college trustees is a privileged communication.

8. LIBEL AND SLANDER—*Privileged Communications—Questions for Court.*

The facts being uncontroverted, it is a question for the Court whether a publication is privileged.

9 LIBEL AND SLANDER—*Privileged Communications—Questions for Court.*

Where a publication is privileged, or conditionally privileged, whether there is intrinsic or extrinsic evidence of malice, is a question of law for the Court.

10. LIBEL AND SLANDER—*Malice — Privileged Communications—Evidence.*

The alleged libelous statements herein set forth do not bear such clear evidence of malice on their face as to entitle them to be considered by the jury as evidence of malice.

11. LIBEL AND SLANDER—*Pleading—Complaint—Answer.*

The failure of defendant to deny the allegations of complaint of good character of plaintiff and his innocence of charges made does not amount to an admission that the publication complained of was false.

12. EVIDENCE—*Libel and Slander—Allegations—Surplusage.*

Allegations in complaint of good character and innocence of plaintiff are superfluous, and though not denied by the defendant, are incompetent as evidence.

13. DAMAGES—*Libel and Slander—Evidence.*

Before damages can be recovered by one by reason of words spoken or published of him in his profession or office, he must have been actually engaged in the work of his profession at the time the words were written or spoken.

GATTIS *v.* KILGO.

ACTION by T. J. Gattis against J. C. Kilgo, B. N. Duke and W. R. Odell, heard by Judge *W. A. Hoke* and a jury, at November Term, 1900, of the Superior Court of GRANVILLE County. From a judgment for the plaintiff, the defendants appealed.

*Boone, Bryant & Biggs, Guthrie & Guthrie, Hicks & Minor, A. W. Graham,* and *S. M. Gattis,* for the plaintiff.

*Winston & Fuller, Royster & Hobgood,* and *T. T. Hicks,* for the defendants.

MONTGOMERY, J.   The publication of the pamphlet that contained the speech of the defendant Kilgo, which published speech is the foundation of the plaintiff's cause of action, was the result of an investigation held by the Board of Trustees of Trinity College, of which body the defendants Duke and Odell were members, of certain charges of incompetency and moral unfitness against the President of the college, the defendant Kilgo.   There was also included in these charges a statement to the effect that the spirit of commercialism in its lowest and most dangerous form was being introduced into the student life, notwithstanding the claim of the school for patronage that the foundation and development of Christian character was one of its chief aims.   The charges were made by one of the most distinguished and influential citizens of the State, accomplished in nearly every department of learning, and himself one of the Board of Trustees of the institution; and they were published far and wide, originally in a newspaper printed in Raleigh, and probably read by more people than any other paper circulated in the State.   Investigation of the charges was a right of the defendant Kilgo, as they affected his personal and professional character; it was a matter of necessity so far as the future of the college was concerned.   Without an investigation and a refutation of the

charges, or the prompt removal of the President and the sinister influences which were alleged to be at work in the college, if the charges should be found true, the institution would necessarily suffer in its reputation with a consequent decrease in its patronage.

Whether or not the speech of the defendant Kilgo, published by the defendants in pamphlet form and embodied with the whole of the proceedings in the matter of the investigation, was a privileged communication, was a question of law, there having been no dispute or uncertainty as to the circumstances attending the publication, and his Honor properly tried the case as one of qualified privilege. The college was in one sense a public institution. Its patronage was from several States, especially from North and South Carolina, and the investigation was therefore one of general public concern. Folkard's Starkie on Slander and Libel, 223.

In vindication of the personal character of the defendant Kilgo, he had the right to publish a fair and honest account of the acts done in the course of the investigation, provided the publication was free from malice, and on this point his Honor, in response to a special prayer of the defendants' counsel in the following words: "That if the jury believed from the evidence that the defendant Kilgo had been subject to criticism and adverse comments and attacks in the press (from another than the plaintiff), and he bone fide believed that the publication of the proceedings before the Board of Trustees was necessary in defence of his character and standing, and he published the speech as part of the proceedings in order that the whole investigation might be laid before the public that it might judge of the truth of the charges against him, then the jury should answer the third issue (as to malice), 'No.' as to said Kilgo," instructed the jury, after reading the prayer to them: "A man first assailed in public prints has a

right to defend himself, and if facts stated in prayer are true and publication was made by defendant Kilgo in good faith and solely for reasons given, there would be no malice as to him, and jury should by their verdict excuse defendant Kilgo on third issue." The defendants excepted to the word "solely."

We are sure that they got all that they were entitled to on that point of the case. The defendants Duke and Odell, as trustees of the college, were entrusted with the duty to have the charges inquired into by the Board of Trustees—the proper tribunal for that purpose—and they had the right to publish the proceedings for the purpose of giving to the public and to the patrons of the college all the information concerning the whole matter, which the investigation brought out, provided the publication should be made without malice ; and his Honor therefore properly instructed the jury, "if, however, the defendants published in good faith for the reasons claimed by them, actuated solely by a desire to protect the college and give its patrons correct and full information of the entire proceedings, in such case there would be no malice and the jury should answer the third issue "No," and this, though the charges contained therein may have been both false and defamatory." And he said further, "if these defamatory statements were false and defendants published with a design and intent to injure the plaintiff, or because they were mad at him for testifying against the President of the college, if that was the motive, or one of the motives that induced the publication, it would be malicious, and you will answer the issue 'Yes.' "

And his Honor correctly instructed the jury that the publication being admitted and being a qualifiedly privileged one, it was incumbent on the plaintiff to prove by the greater weight of evidence, not only that the publication was false, but that it was also malicious. In his charge on the question

GATTIS *v.* KILGO.

of malice, his Honor was also correct in stating in substance that although the malice, which is a necessary ingredient in the constitution of a libel where the publication is privileged, is actual or express malice—that which is popularly called malice—and not malice in law, yet that it was not necessary that the ill-will or malice of the defendant should have been against the plaintiff personally, and that if the publication was not in good faith for the reason claimed, but from a wrongful, indirect and ulterior motive and was false, the same would be malicious. The request, therefore, of the defendants' counsel to the Court for instruction that malice in fact means personal ill-will and a desire to injure the plaintiff was properly refused. *Ramsey v. Cheek,* 109 N. C., 270; Odgers on Libel and Slander, 266, 267.

Our consideration of this case has been so far confined to a discussion of the most important principles of law involved in the question of malice, prefaced with a general but sufficiently explanatory statement of the nature of the action, both for the reasons that what we may have to say in the further consideration of the appeal may be more clearly understood, and that our own views on those principles of law may be known to those interested in the future of the case; for there are, in our opinion, errors, certainly in two important instructions given by his Honor to the jury at the request of the plaintiff, and further error in the admission of testimony offered by the plaintiff, and for which a new trial must be ordered.

The case was hotly contested in the trial below, continuing for several days, and his Honor who presided with his usual painstaking and ability, was compelled to rule instantly upon many of the most difficult questions of law and perplexing rules of evidence, notice of all of which can not be reasonably expected of this Court.

We will now take up for consideration what we think are errors sufficiently grave to make necessary a new trial of this action.

His Honor, at the plaintiffs' request, instructed the jury: "If you find from the evidence that the defendant Kilgo recklessly used language towards the plaintiff, which was uncalled for and in excess of the occasion, then this fact is evidence of malice, and if the defendants Duke and Odell assisted in publishing the said language, and were indifferent as to its consequences to the plaintiff, then this is evidence of malice against the defendants Duke and Odell." We are of the opinion that the speech of the defendant Kilgo was absolutely privileged. As we have said, the investigation was a duty of the trustees and a right of the defendant Kilgo and the tribunal, the Board of Trustees of the college was the proper forum for the hearing of the matters embraced in the charges against the defendant Kilgo as President of the college, and of the other matters included in the charges. We can see no difference, and we believe none can be shown, between the position of the defendant Kilgo on trial before the tribunal of the Board of Trustees upon charges against his own personal character and against his competency and fitness for the presidency of the college, and his position would be before a court of justice on trial for an offence against the laws of the land, or in the prosecution or defence of a civil right. In each place, he would have the right to present his case thoroughly, and if in the heat of argument or under the impulse of anger he should use language violent or excessive towards his adversary, or to a witness, it would be nevertheless, absolutely privileged, provided what he said was relevant and pertinent to the issue. It is settled in this State that upon a trial in a court of law a party would have complete immunity under such conditions. In *Shelfer v. Gooding*, 47 N. C., 175, the plaintiff, upon the trial of a slave of the defendant before two Justices of the Peace upon a charge of destroying the plaintiff's property, was examined as a witness. The defendant, after having been asked by the Justices of the Peace if

GATTIS *v.* KILGO.

he wished to be heard for his slave, addressed himself to the
Justices, saying: "I wish you gentlemen to understand that
what Amos Shelfer, the plaintiff, has sworn, is a tissue of
falsehood and a damned lie from beginning to end." In an
action of slander brought by the plaintiff against the defend-
ant for the use of the words, this Court (Judge Battle deliver-
ing the opinion), said: "After the plaintiff in this suit was
sworn as a witness, it was undoubtedly competent for the
defendant to insist before the Magistrates in defence of his
slave that what the plaintiff had sworn to was false; and we
see no difference whether that was insisted on in an elaborate
argument or in the short allegation which he thought proper
to employ. What he said was certainly pertinent and ma-
terial to the cause. The question then is, can an action of
slander be maintained against him for the words which he
uttered, considered either as counsel or party? We think
that, upon principle, it ought not to be, and that the weight of
authority is decidedly in favor of such principle." And in
the same case, the Court, after discussing the questions at
length and analyzing numerous decided cases, said: "We
think that we have shown by abundant authority that a coun-
sel, or party, is entirely protected against an action for slan-
der for whatever he may chose to say relevant and pertinent
to the matter before the Court, and that no inquiry into his
motives will be permitted."

In *Nissen v. Cramer,* 104 N. C., 574, the Court cited with
approval the last-mentioned case, and said: "It was con-
ceded on the argument, and at all events it is settled law, that
one who appears in person in his own behalf, or on behalf of
another, or counsel representing a party on the trial of an
action may say in the progress of the trial anything in refer-
ence to the character or conduct of the opposing party, or
witnesses, that is relevant and pertinent to the question or
issue before the Court or jury, without incurring any liability

whatever in an action of slander predicated upon the language used. The occasion gives ample protection if the utterances are not irrelevant."

It may be said that the defendant Kilgo, in his own defence, not only confined himself to that which was pertinent and relevant, but kept himself within the bounds of fair inferences from the testimony adduced on the investigation—that of Mr. Gattis himself and Mr. Peacock. The language used by the defendant was strong and caustic, but no one can read the evidence and the speech and fail to come to the conclusion that the speaker felt that he had strong provocation. The spoken words of the defendant Kilgo, then, being entirely privileged, it follows that if there was actual malice in the publication of them by the other defendants, the occasion being a privileged one, as we have said, such malice must be shown by other means than by indifference as to its consequences to the plaintiff.

His Honor gave another instruction, at the plaintiff's request, in the following words: "On the question whether there was malice in the publication of the words complained of, you have a right to consider the words of the libel itself and the circumstances attending its publication." If the words of the libel are clearly malicious, that is, if they show clear evidence of actual malice on their face, they may be considered by the jury, as in the case of *Ramsey v. Cheek,* 109 N. C., 270. There, the defendant wrote to the Superintendent of the Census about a public matter, an occasion of qualified privilege, and this Court sustained the ruling of the Court below in having submitted to the jury for their consideration the words of the libel itself, because the words were evidence of malice on their face. There, Cheek wrote of Ramsey "that Ramsey was the leader in defrauding me and Mr. Nichols out of our elections last fall."

Where fraud is charged, the libel itself may be submitted

to the jury as evidence of malice. Odgers on Libel and
Slander, 225. There is no such evidence of malice in the
language of the publication in the case before the Court, and
in that view the words of the libel ought not to have been sub-
mitted to the jury. The only other grounds upon which the
words of the libel could have been considered by the jury was
that the published speech was "much too violent for the oc-
casion and circumstances to which it was applied," or "ut-
terly beyond and disproportionate to the facts." In consid-
ering that view, a prior question is to be asked and answered,
and that is, who is to determine whether the words of the
libel are excessive and violent? Is it a question of law for
the Court, or is it a question of fact for the jury? The an-
swer is, it is a question for the Court to decide. And it re-
duces itself to the bare inquiry whether or not there is on the
face of the words of the libel any evidence of malice that
ought to go to the jury. In Townsend on Slander and Libel,
sec. 288, may be found these words: "The facts being un-
controverted, the Court is to determine whether or not the
publication is absolutely privileged, that of course determines
the action. If the Court decides the publication is conditionally
privileged, then it is a matter of law for the Court to determine
whether there is any intrinsic or extrinsic evidence of malice.
If the Court decides this question in the negative, it directs a
nonsuit or a verdict for the defendant without reference to the
jury." But the prior question is always, is there any evi-
dence of malice to go to the jury? Odgers on Libel and
Slander, 279. "When the Judge rules that the occasion was
privileged then if at the close of the plaintiff's case, there
being no evidence of malice either on the face of the libel
itself or extrinsically, it is the duty of the Judge to direct a
nonsuit or a verdict for the defendant." Folkard's Starkie
on Slander and Libel, sec. 674. It may be a matter of diffi-
culty, in some cases, for the Court to determine when the

words of a libel should be submitted to the jury as evidence
in themselves of malice.   In Odgers on Libel and Slander,
page 280, the test is laid down in these words:   "Take the
facts as they appeared to the defendant's mind at the time of
the publication: are the terms used such as the defendant
might have honestly and *bona fide* employed under the cir-
cumstances?   If so, there being no other evidence of malice,
the Judge should stop the case."   It is perfectly clear to us
that if in all cases of privileged communications, the words of
the published matter are to be submitted to the jury for their
consideration as evidence of malice, then the privileged occa-
sion would be no protection whatever.   A privileged com-
munication and one not privileged would stand on precisely
the same footing if the words of the privileged one could be
made evidence of malice in all cases.   The tendency of the
courts is not to give the language of privileged communica-
tions too strict a scrutiny.   "To hold all excess beyond the
absolute exigency of the occasion to be evidence of malice,
would in effect greatly limit, if not altogether defeat, that
protection which the law throws over privileged communica-
tions."   Odgers on Libel and Slander, 281.   "But where a
defamatory communication is published in self-defence, al-
though there may be some expressions contained in it which
go beyond what is necessary for self-defence, still it does not
therefore follow that they afford evidence of malice which the
plaintiff is entitled to have submitted to a jury.   To submit
the language of privileged communications to a strict scrutiny
and to hold all excess beyond the absolute exigency of the
occasion to be evidence of malice, would in effect greatly
limit, if not altogether defeat, that protection which the law
throws over privileged communications."   Quoted in Folk-
ard's Starkie on Libel and Slander, sec. 577, from the judg-
ment delivered in *Laughton v. The Bishop of Lodar and Man,*
9 Mod. P. C. C. (N. S.), 337.

GATTIS *v.* KILGO.

And now to conclude what we have to say on the question whether there was intrinsic malice (malice on the face of the libel), let us take the facts as they appeared in the defendant's mind at the time of the publication: Are the terms such as the defendant might have honestly and *bona fide* employed under the circumstances ? The parts of the published speech of the defendant Kilgo, and upon which the cause of action is founded, are these: "If you will take the whole situation and connect it with the testimony of Mr. Gattis, you will likely find the original slanderer." And, as to the testimony of Mr. Gattis, that he would not have testified for a hundred dollars, the defendant Kilgo said, "one hundred dollars is a high price for him, and means that an ordinary man would have given a high price for a like commodity. Behind a pious smile, a religious walk and a solemn twitch of the coat-tail, many men carry a spirit unworthy of them." Another expression was that the plaintiff gossiped too much in South Carolina. And in speaking of Gattis' wit at defendant's expense, the defendant said: "Poor wit over the suffering heart of his brother whom he has lacerated in the dark;" and he further said that the plaintiff's conduct had been vicious, and that "between a man's hiding himself by the highway and making a victim of an innocent traveller, and a man who, in the dark, assassinates character, send me to the woods with a revolver and let me murder any passer-by rather than malign my fellow-men." And he further published that at the store of Mr. Gattis "he heard unchristian gossip, until decency demanded that he keep out of such a crowd." He repeated that the plaintiff was the original gossip and maligner, that he had foully dealt with the defendant, that he talked too much, that the truth had small opportunity in his hands, and asked the Board of Trustees, "Is he worthy of your credence ? Read his testimony and mark his dodging." All of the above language is, as we have said, strong and harsh. But under all

the circumstances, was it "utterly beyond and disproportionate to the facts?" Might the defendant have used the language honestly and *bona fide* under all the conditions and surroundings? We can not tell whether his Honor submitted the words of the publication to the jury because he was of the opinion that it had to be done in all cases of qualified privilege, or whether he thought the language was violent and expressive. If from the latter view, it has to be admitted, as is said in Odgers on Libel and Slander, that the "same piece of evidence may make different impressions on different Judges," and we are compelled to differ from his Honor in the premises.

The evidence of the plaintiff himself and that of the witness Peacock before the Board of Trustees make it clear to our minds that the language of the published speech, though strong and caustic, was, under all the surroundings and circumstances, not so excessive and violent in expression as to become thereby intrinsic evidence of malice. It may have been intemperate and exaggerated, and yet not so violent and excessive as to be itself evidence of malice. It is but just to all parties concerned to recite the whole of the evidence of the plaintiff and that of Mr. Peacock, as we had to set out the parts of the speech of the defendant Kilgo, which the plaintiff complained of. It is proper also to say that, on the investigation before the Board of Trustees, the defendant introduced depositions of fifteen witnesses, prominent in Church and State, who testified that his general character was of high order, and that in his ecclesiastical ways and life his methods were honorable, and always open and sincere. And the two witnesses from that State whose depositions were offered by the prosecution, while they said that the defendant Kilgo had the reputation of being a manipulator in Church and educational matters, both stated that his moral character was good. One of them said, "His moral character is good, but some of the brethren

GATTIS *v.* KILGO.

did believe that he was somewhat of a manipulator, that is, that he was not mean or low, but that he would use his influence to control things. I don't say that is the opinion of the majority, but it is the opinion of some." And the other one said, "I may have heard that he was a manipulator, but those words are too strong; he likes to have his way, not that he was a trickster, but that he was a determined man, and liked to manage and have his way. He was not a negative man, but always a positive man, and so far as his character is concerned, if this was an attack on his veracity for manhood, general or moral character, it must not go in this State, for his character is first-class in every sense." Mr. Gattis had a number of most reputable witnesses to prove that his general character was good at the trial below.

## MR. GATTIS's EVIDENCE.

Mr. Gattis: Mr. President, may I be allowed to state my reason for being here now?

Mr. Southgate: I should think it would be in order for the question to be asked you by the prosecutor, however, if the defense has no objection, you may do so.

Mr. Gattis: I would like to make the explanation beforehand. I wish to say that perhaps a month ago I was requested to be here as a witness and declined positively to do so. The matter was pressed upon me. I still declined, and stated that under no circumstances would I testify for either party, unless my Conference and Bishops should require it at my hands. I was informed a day or two ago that if I declined my name would be used here, and friends advised me to be here and hear what would be said. I suppose that is sufficient.

Mr. Oglesby: What is you name?

Mr. Gattis: Thomas Jefferson Gattis.

Mr. O. Where do you reside?

GATTIS *v.* KILGO.

Mr. G. In the town of Durham.

Mr. O. Did you ever live in South Carolina?

Mr. G. No, sir.

Mr. O. Did you know John C. Kilgo, President of Trinity College?

Mr. G. Yes, sir.

Mr. O. How long have you known him?

Mr. G. I think five years. I am not positive, perhaps a little longer than that. I formed his acquaintance at Asheville, possibly six or seven years ago, in 1891.

Mr. O. Do you know his general reputation in South Carolina?

Mr. G. I think so.

Dr. Kilgo: I wish you would answer that question positively, Mr. Gattis.

Mr. G. Well, I know it.

Mr. O. What is it?

Mr. G. With regard to what, sir?

Mr. O. I want to know his general character.

Mr. G. For what, truth?

Mr. O. For everything?

Mr. G. For some things it is good, for others it is bad.

Mr. O. He has been charged with being a wire-puller of the ward type, is that true?

Mr. G. I have never heard that word "ward." Dr. Kilgo does have the reputation in South Carolina of being a wire-puller.

Dr. Kilgo: You explained, Mr. Gattis, that you came here under pressure, pressure from what? Who pressed you?

Mr. G. The prosecution.

Dr. K. Mr. Oglesby?

Mr. G. No, sir; Judge Clark.

Dr. K. You state that you were advised that your name would be used; who advised you as to that?

Mr. G. Two or three parties.

Dr. K. Well, I want to know them.

Mr. G. Judge Clark.

Dr. K. Who are the others?

Mr. G. I don't feel that I should give them.

Dr. K. Why, Mr. Gattis?

Mr. G. I don't think it proper or necessary.

Dr. K. Are they members of this Board?

Mr. G. No, sir.

Dr. K. Do they live in Durham?

Mr. G. Yes, sir.

Dr. K. Have they anything to do with this court.

Mr. G. I decline to answer, Dr. Kilgo, any further questions in regard to that.

Dr. K. I asked you a simple question, for I wish to know whether outside parties have been working in this matter. This is an important question and I call the attention of the board to the fact that Mr. Gattis will not say whether they have any connection with this court or not. You still decline?

Mr. G. Yes, sir.

Dr. K. You say you never lived in South Carolina?

Mr. G. No, sir.

Dr. K. Have you any business in South Carolina?

Mr. G. I have.

Dr. K. What is it?

Mr. G. I am appointed by the South Carolina Conference as Colporteur. Have been for three years.

Dr. K. Did Dr. Kilgo go with you when you were appointed, and say something good to try to get you appointed?

Mr. G. He went with me before I was appointed.

Dr. K. But did he not try to help the brethren to understand you, and get you appointed to that position?

Mr. G. Dr. Kilgo was my friend, so far as I know.  He said some good things for me on the Conference floor.

Dr. K. And you have known him from '91?

Mr. G. Well, sir, I was introduced to him in '91, and have not known him except when he came to North Carolina.

Dr. K. When he came to North Carolina did he try to help you in your work?

Mr. G. I think so for a time.

Dr. K. Did he not tell you of books, and make speeches on the Conference floors for you?

Mr. G. Yes, sir.

Dr. K. Have you not talked a great deal about Dr. Kilgo in the last year or two?

Mr. G. Not when I could well help it.

Dr. K. Did you not say awhile ago that you understood that the Dukes were out with Dr. Kilgo?

Mr. G. I did not.

Dr. K. Did not say you had ever heard it?

Mr. G. Yes, sir, I think I said I heard it.

Dr. K. Did you say anything to Dr. Kilgo about it?

Mr. G. No, sir.

Dr. K. Have you not talked about him otherwise?

Mr. G. I do not remember, sir.

Dr. K. Have you never talked with Judge Clark about him?

Mr. G. I had one conversation with him about several matters, and Dr. Kilgo was mentioned.

Dr. K. Did you not tell Judge Clark about his bad reputation in South Carolina?

Mr. G. I think it very likely that something was said of that kind.

Dr. K. Now, Mr. Gattis, don't you *know* that you told Judge Clark that?

Mr. G. I told him that I had no recollection of a single sentence that I expressed in regard to you.

Dr. K. But did you not tell Judge Clark about his South Carolina reputation being that of a wire-pulling politician ?

Mr. G. I am not able to answer that question. Whether I did or not, that certainly is his reputation.

Dr. K. I ask you whether you did not tell Judge Clark that ?

Mr. G. I decline to answer.

Dr. K. But you say Judge Clark told you you must come here or he would use your name. . Why did he tell you that ?

Mr. G. I don't know, sir.

Dr. K. You were not coming without his putting that pressure upon you ?

Mr. G. No, sir.

Dr. K. Though you had talked to him about Dr. Kilgo ?

Mr. G. Yes, sir, I had a conversation with him.

Dr. K. Has not Dr. Kilgo quit going to your store ?

Mr. G. I think he has.

Dr. K. Do you know why he quit ?

Mr. G. Yes, sir, I think I do.

Dr. K. Have you talked with other people besides Judge Clark ?

Mr. G. Yes, sir; you have been a general subject of conversation both in North and South Carolina. I have very frequently avoided conversations about you. You are not quite of so much importance as that I want to talk about you all the time ?

Dr. K. Have you not the reputation of talking too much about your brethren ?

Mr. G. I don't know, sir.

Dr. K. Isn't it your habit to talk about your brethren ?

Mr. G. I am not here to be questioned about these things ; at least to answer them.

Dr. K. Haven't you frequently brought very kind messages to Dr. Kilgo from South Carolina?

Mr. G. Occasionally, yes, sir.

Dr. K. Told him of his friends?

Mr. G. Yes, sir.

Dr. K. Did you ever tell him that was his reputation?

Mr. G. No, sir.

Dr. K. To the Presiding Elder?

Mr. G. No, sir.

Dr. K. To his pastor?

Mr. G. I don't remember.

Dr. K. So you have no recollection now of telling it to anybody but Judge Clark?

Mr. G. I decline to answer.

Dr. K. Do you suppose that Judge Clark would have ever made the statement that you made, unless you had had the conversation with him that you had?   .

Mr. G. I decline to answer.

Dr. K. Did Judge Clark go to see you the other day?

Mr. G. I decline to answer that.

Dr. K. Why do you decline?

Mr. G. Because I don't think you have any right to ask those questions.

Dr. K. Wasn't your son in Trinity awhile ago?

Mr. G. Yes, sir.

Dr. K. Did the college charge him any tuition?

Mr. G. No, sir.

Judge Clark:   How long did you travel in South Carolina as Colporteur?

Mr. G. This is the third year.

Judge Clark: Did your business take you into all parts of the State?

Mr. G. In nearly all of the large towns.

Judge Clark: You know personally nearly all our minis- . ters down there?

Mr. G. Nearly all of them.

Judge Clark: Do you know the leading laymen?

Mr. G. A good many of them.

Judge Clark: I want to ask Mr. Gattis one question. Do you know the reputation of Mr. T. C. Ligon, of the South Carolina Conference?

Mr. G. Yes, sir.

Judge Clark: Well, what is it?

Mr. G. Very good indeed, so far as I know.

## DR. PEACOCK'S EVIDENCE.

Dr. Peacock was placed on the stand.

Dr. Kilgo: What is your name?

Ans. Dred Peacock.

Dr. K. Where do you reside?

Ans. Greensboro, N. C.

Dr. K. What is your occupation?

Ans. President of Greensboro Female College.

Dr. K. Did you ever have any talk with any one about the Laurens Conference of South Carolina, from which Dr. Kilgo was transferred to the North Carolina Conference?

Ans. Yes, sir. I don't remember as to Laurens Conference. I do not know where it was held. I have never been in South Carolina.

Dr. K. Who was that man?

Ans. Mr. T. J. Gattis.

Dr. K. What did he say to you about that?

Ans. I don't know that I could quote his words, but some time in the winter after the South Carolina Conference he and I were talking; I think I was in his store. He said that he had been to the South Carolina Conference and that it was worth going there to see the reception that was given to you in your old State, and that it amounted to an ovation, and that you would need a pretty steady head if it did not turn

you. He was almost extravagant in his description of the reception given you. It seems to me that he said something about a water service given to you.

Dr. K. Have you ever heard him say anything that would indicate that he had a different opinion since that time?

Ans. Yes, sir.

Dr. K. Can you tell us anything about that?

Ans. Yes, sir. About a year ago we were on a train together and he brought it up himself and knowing his feelings on the matter I have avoided mentioning your name where he was, because we have always been friends and I never like to disagree with a man when I can help it if it will do no good, unless I think I can change him to my side, and as I had no hope of that I avoided your name. But he brought it up himself, and one thing he stated was that it seemed very strange to the people of South Carolina that the people of North Carolina were such fools over Kilgo. They could not understand it. That was the statement, and it impressed me at the time as being a little different from the other one.

But there is another reason why the published speech was not intrinsic evidence of malice. We have seen and have said that the speech itself, when it was delivered and before its publication, was entirely and absolutely privileged. It could not, therefore, have been used as evidence of malice in itself after its publication. It was not only not malicious when spoken, but it was privileged. The defendant's motive could not be inquired into. *Shelfer v. Gooding, supra.* In the method and manner of its publication and distribution and the facts connected therewith, malice in fact might be proved, but not by the communication itself.

The defendants' exceptions to the introduction and admission in evidence of the first and second allegations of the complaint and the defendants' answer, to show their failure to answer the same, we think is well taken. Those allega-

tions concern the plaintiff's good character and innocence of the charges imputed to him by the defendant Kilgo. The good character and innocence of the plaintiff were immaterial averments and need not to have been proved. Eaton's Forms, page 154. They may be rejected as surplusage. Folkard's Starkie, *supra,* sec. 525. They are not traversable. "It is usual in all cases to commence the declaration with a statement of the plaintiff's good character and his innocence of the crime imputed to him by the defendant, but as these inducements are not traversable they may be omitted, and the declaration may commence with a statement of defendant's malicious intention to injure the plaintiff." 2 Sanders on Pl. and Ev., 794. The usual introductory averment of the plaintiff's good name and reputation, etc., is altogether superfluous, his good character being presumed. 2 Greenleaf Ev., 406. The injury to the defendants in the receiving of this evidence by the Court became more serious, when his Honor's charge, in connection with it, is taken into consideration. He said, "Plaintiff contends that the defendants practically admitted that this charge against the plaintiff was untrue; that the first and second allegations of the complaint, in which they allege that the plaintiff was in good standing and enjoying the confidence of his fellow-men, and that in their answer, upon which they joined issue, they did not deny that this is true; that the first and second allegations are not denied; that it amounts to a practical admission that this man was not the kind of man that that speech of Dr. Kilgo's said he was." His Honor instructed the jury to consider that testimony with the other in the case as bearing upon the second issue—the falsity of the charge. The character and innocence of the plaintiff were not the matters at issue. They were not even material averments, as we have seen, and sec. 268 of The Code has no application. Whether or not the alleged defamatory matter was false and malicious, was the

material issue, in the case, and the defendants' failure to answer the first and second allegations of the complaint was in no sense an admission that the publication was false.

The plaintiff was allowed, under objection of defendants, to give evidence on the subject of damages which he had sustained in his clerical calling. We think the evidence was incompetent. The plaintiff, it is true, was regularly ordained and set apart as a minister of the Methodist Episcopal Church, South, but he had had no charge for twelve years preceding the commencement of this action. He had for that time been engaged in other work than the Christion ministry.

Before damages can be recovered by one, by reason of words spoken or published of him in his profession or office, he must have been actually engaged in the work of his profession or in the possession of the office at the time the words were written or spoken. *McKee v. Wilson*, 87 N. C., 302; *Edwards v. Howell*, 32 N. C., 211; Abbott's Trial Ev., 831; Townsend on Slander and Libel, sec. 189; Newell on Slander and Libel, page 175; Folkard's Starkie, *supra*, sec. 99, where it is said: "The action extends to words spoken of men in their professions as barristers, attorneys, physicians, surgeons and clergymen. But words spoken of a clergyman as such, would not be actionable unless he had some benefice or preferment of which he might be deprived if the words were true. The reason usually given for supporting the action in such a case is that the imputation would be cause of deprivation."

For the reasons given there must be a new trial.

New trial.

CLARK, J., did not sit on the hearing of this appeal.