This action was brought to recover damages for slander, assault, and false arrest, or imprisonment, and was here at a former term of this Court (169 N.C. 421), but was not finally decided. It comes before us now to be decided as to its merits, and the defendant has reserved but one exception, by his motion to nonsuit, which requires us to decide only whether there is any evidence of the slander or false imprisonment, the jury having returned the following verdict:
1. Did John Stone wrongfully imprison the plaintiff, as alleged in the complaint? Answer: Yes.
2. If so, was such wrongful imprisonment authorized or ratified by the defendant? Answer: Yes.
3. If so, what damages, if any, is the plaintiff entitled to recover? Answer: $1,000. (590)
4. Did the defendant Stone speak of and concerning the plaintiff language as alleged in the first cause of action? Answer: Yes.
5. If so, was said language true? Answer: No.
6. Was the language spoken of the plaintiff spoken maliciously? Answer: Yes.
7. What damages, if any, is the plaintiff entitled to recover therefor? Answer: $500. *Page 634 
As the motion to nonsuit is equivalent to a denial that there is any evidence to support the verdict, it will be necessary to state so much of it as bears upon the essential features of the case. It may be said here that there was strong testimony to the effect that plaintiff had been taking different articles from the store from time to time without having them charged to her, as was required by the rules and regulations of the store. The other lady clerks freely and positively testified to having seen her do so, and goods were found in her possession for which she had not accounted. When a clerk desired to purchase anything, it was her duty to charge it on a ticket and send the packages and ticket to the cashier by the overhead trolley. There was ample evidence to show that she had frequently violated this rule, and had taken goods away for herself without having any record of the transaction with the cashier. Clerks were allowed a discount on their purchases. The clerks had reported the alleged pilfering of the plaintiff to the defendant, who was manager of the store, and he had requested that a close watch be kept on her. The slander and false arrest is fully described by the plaintiff in her testimony, as follows:
"I live in Greensboro, but formerly lived in Sanford, where my mother and father now live. I was raised there. I was about 22 years old when I went to Greensboro in April, 1911. I first went to work with C. H. Dorsett as saleslady, who was engaged in the mercantile business. I remained with him until 15 September, 1913. I then went to work with Ellis, Stone Co. as saleslady. They conducted a department store. I had charge of the hose stock at the time I went there. I remained with them until 4 December, 1914. The day on which the matters complained of occurred was a rainy and cold day. We didn't have many customers in the store. Some time between 5 and 6 o'clock Miss Bessie Hampton came in. She said she wanted to purchase a drop skirt. Miss Slack, who had charge of that department, had left the store a short while before. I said, `I will go with you and show it to you.' We went on the second floor and looked at the skirts and also at some coat suits. We fooled around up there until about twenty minutes past 6 o'clock. I realized that the store was being closed. We came downstairs and the lights were (591) practically all off. She apologized for keeping me until twenty minutes past six. I did not see any one else in the store, but there was one or two lights left burning. I was in the habit of leaving the store about 6 o'clock, or soon thereafter. I hurried back to the cloakroom and got my umbrella and raincoat and hat and came on out, and came by the counter where I usually kept my pocketbook and got it and was going out of the door. I had my hand on the door. Mr. Hicks was standing up at the front of the store. He *Page 635 
said, `Little girl, it is raining bad outside and you will get wet.' I said, `No, I have my umbrella and I don't think I will.' He said,' I have got something I want to show you. Wouldn't you like to see it?' I said, `I am a little late, but I will be glad to see it.' For the last two or three weeks he had talked very freely of Christmas presents. He was going with a young lady in the store, and two or three times he had asked me what I thought would be nice to give this young lady for a Christmas gift, and naturally, when he said he had something to show me, I thought that was what it was. We started back in the store. I thought when we walked back in the store that he was going to where there was better light. There was a light burning over the balcony. We went on upstairs, and when we got to where this light was burning I thought we were going into Mr. Hick's office — he was the bookkeeper — but instead of going into the office we turned the other way and went over another short flight of steps and got to the third floor, and then we walked, I guess, the distance of the courtroom back towards the front of the store, and right in the center of the stockroom is what they called the `Boss's room' — a little room Mr. Stone had built there privately to keep away from the traveling men. We walked in and sat down.
"John Stone (the defendant's son) was floor manager at that time. John came up and walked in and said, `Hello, Miss Riley; what is this — a little party?' I said, `No, it is not a little party.' I said, `It is a thief you have got up here. You sit down, John, and tell me what you have seen me take.' He says, `I have never seen you take anything, but others have.' I said, `What others? That is just what I want to know.' He said, `Well, lot of others; all of the ladies in the store. One lady has been to us three times and told us unless we got rid of you that she would quit her job.' I tried to get John to tell me who had been telling him I had been stealing and what they had been telling him I had been taking, and he said that just all the ladies had; that this one lady had been to them three times and told them that unless they got rid of me she would quit her job; that she would not work in the store with a person of that sort. I said, `I am sick, my back is hurting me so bad I don't know what to do. Well, it is 7 o'clock, suppose I go to supper.'
"John had already told me that his father would be in on the 7:10 train, and that he would see me, so I asked him (592) to let me go to supper. `No, you cannot go to supper; you will have to stay here until the boss comes.' So I stayed a little while, I don't know just how long, and Mr. Stone came in. He (Hicks) did not stay in the room until Mr. Stone came. John Stone did, but Mr. Hicks got up and went downstairs. I suppose in about twenty minutes Mr. Stone came up. I do not remember about Mr. *Page 636 
Hicks. Mr. Stone came in and told me that he understood there was some trouble in the office; that he was sorry, and that he knew that I was up there, and that he had been knowing for a long time that I had been stealing, and all he wanted me to do was to confess it to him and tell him all about it. I said, `Mr. Stone, I have tried my best to explain to the bookkeeper, Mr. Hicks, and John Stone, but they will not listen. I think if you will listen to me a little while I can explain to you just how this trouble occurred.' He said, `Miss Riley, there is no use explaining, we have facts.' I said, `What facts?' He said, `Just plenty of them. I have an itemized statement in my safe of the list of things that you have been taking out of the store.' I said, `Suppose you get it and show it to me.' He said, `No, it is too late tonight and we will not trouble about that.' I said, `Mr. Stone, who has been telling you that I have been taking these things?' He said, `The ladies in the store.' Said nearly all of them had orders to watch me. `Your pocketbook has been gone into daily and your pockets have been gone into daily. Your tickets have all been watched daily. I have had the bookkeeper to watch you and had the cashier to watch you, and we just have plenty of facts in the case.' He said, `Now, I will tell you what I want you to do for me,' but first I asked him what he had seen me take, and he said he had seen me take several things; that one time I had a pile of goods under the counter and took them out piece by piece, and I didn't make any tickets for them. He said that was way back in the early spring; that he could date it back six months before he went North in the spring. I said, `I can tell you exactly what was under the counter and how came it there.' I told him that when those new viole patterns came in I did cut off three dress patterns for myself. I sent one of them to my mother at Sanford, and sent one to my sister at Sanford. I simply cut them off and put them under there. I sent two of them to the cashier's stand, and the cashier wrapped them and parcel posted them, and they were sent to my mother and sister at Sanford, and the other one I took and paid for it and took it home and used it. He said that there was no use trying to explain, that I had taken nice silk dress patterns and wool dress patterns, and there was no use for me to deny that I had taken these things, because he had absolute proof of the fact. He said, `I don't hope for you to remember all of them. I just want you to square yourself around at this desk and write down for me on paper a few of (593) the things you have taken. I don't hope for you to remember all of these things.' I said, `Mr. Stone, if you think now that you are going to get me to square myself and write down on paper for you things that I have not got, I am not going to do it. You, nor a regiment like you, couldn't make me do that.' Then he got mad. *Page 637 
He said, `Well, I didn't know you were going to be biggety and uppish about the thing. I thought you would be willing to confess the matter. Don't you know what it means to you if you don't do it? Don't you know I will have to call an officer and have your room searched, and that will be embarrassing to you and to the people with whom you are living, and you will have to go up and stay in jail all night, and in the morning it will come out in big headlines in the paper, and your people in Sanford will hear of it, and you will be branded as a thief the rest of your life.' I said, `Mr. Stone, I have done all I can to explain.' He got up and called John and said, `John, call an officer. Miss Riley don't think we are giving her a square deal.' I stayed there a few minutes and an officer came in. I later learned it was Mr. McCuiston. Mr. Stone said, `We have a girl here who has been stealing goods away from the store and I want to have her room searched.' Mr. McCuiston turned around to me, or to both of us, and said he would have to explain to me that he would have to have a search warrant before he could search my room against my will. He said, `You will have to have a search warrant before you can have her room searched. We can detain her and get a search warrant and search it against her will.' I said, `I don't want my room searched if there is any other way, but if there is no other way of satisfying Mr. Stone, if he thinks there are goods down there belonging to him, I want you to go search my room. I want him to be satisfied.'
"I thought we were getting up to start, but he said he would have to get an officer to bring a search warrant. I do not know how the officer got the message, whether he was phoned for or not, but in a few minutes Mr. O'Brien came in with, I suppose, a search warrant. I never did see it, and it was never read to me. We got up, Mr. Stone, Mr. O'Brien, and Mr. McCuiston. John Stone and I went downstairs, and when we all got to the front door of the store there was another policeman standing there in front of the store. I do not know who that was. I afterwards learned that it was Mr. Skeens. I think it was the worst night we had that winter. It was rainy, windy, and cold. It was about twenty minutes to nine. I said, `It is just too bad for me to walk home, I would like to have some way to ride,' and John Stone stepped up and said he would go out and get an automobile. He did so, and we all got in and went down to Gorrell Street, where I was rooming at a Mrs. Richard Stone's house. Mr. Stone, Mr. O'Brien, and Mr. McCuiston and myself went in the automobile. There was no one at home but old Mrs. Stone, and she had been in bed a week with grippe, (594) and young Mrs. Stone was upstairs with the babies. Mr. McCuiston said he would get out and go in and tell the lady what we *Page 638 
had come for. We went inside where these empty boxes were that I had sent up that afternoon. I had these little boxes that I had gathered up a week or two before, from time to time. None of them were any size, except the one that had the cretonne bag in it. I had made that that day at dinner. I took these boxes up to the cashier that afternoon — late in the afternoon before the last delivery — and asked him if he would send them out for me; that they were empty boxes that I had collected — nice little white boxes that I thought would be nice to put Christmas presents in. He said that he would send them out. I lifted the lid of one of the boxes and showed it to Mr. Hicks. I had made this cretonne bag for a young lady, and I just told him that was a Christmas gift I had made that day. I took these boxes up to my room that night myself and opened them up, one by one, and I came down to this box; I open it; that purple tie was in it. Mr. Stone lifted the tie out of the box and said, `This is the tie we are looking for. `I knew nothing of the tie being in the box until that time. So they searched my room; went through everything in there. "
Q. "What was it all worth?" A. "Twenty-five dollars. "
"They searched in the dresser drawers; searched my trunk out in the hall, and searched in the closet and in the bed and under the bed, and raised the lid of the heater and looked in there. On a little table I had a few things. I had a little work basket on this table, and in this work basket I had a few little articles I had brought from time to time, and Mr. Stone took all of those things out of the work basket and laid them over on the bed, and when they went through my trunk he made slurring remarks about whatever things were in my trunk, and took up a gown and said, `Ah, ha! don't you think this is too fine for you to wear — the clothes that you have in this trunk — on the salary you are making?' He took up a little voile dress that had some little lace bands in it — real cluny lace — that a traveling man whom Mr. Dorsett bought lace from had given me a year or two before that, and made a remark about that lace being too fine. I had a little pearl garniture in my trunk that I bought before I left Sanford, before I went to Greensboro, and he said that I `could not afford such fine things as that on the salary I made. `Mr. McCuiston remarked about my having too many pairs of shoes. There was a gentleman's collar in my trunk. A young man had been coming to see me for a while before that from Sanford, and in the summer before this he left hurriedly one afternoon and left his collar. He bought the collar or got the collar and stuck it in his pocket. It was an awfully hot day, and after a while he said, `If you don't mind, I will change my collar,' and so he changed his (595) collar and laid the other one on the piano, and that night *Page 639 
when he left he forgot his collar, and when I went upstairs and dumped it in the trunk and it stayed there. Mr. Stone when he came across this man's collar, picked it up and showed it to Mr. McCuiston, and in a sneering way remarked about' Miss Riley having a man's collar in her trunk.'
"They stayed in my room until about a quarter till eleven, I think, when they left. Mr. McCuiston turned to me and says, `Get yourself ready; you will have to go up to the police headquarters with me tonight.' He says, `I will promise not to put you in jail; that is what I ought to do, but I will promise not to do that. It is a mighty bad night and you can stay in the police office.' He says, `There is a chair there and a couch, and you can be fairly comfortable.' I said, `Is it as bad as that? Isn't there any way in the world I could arrange to stay in my room?' He says, `You can give bond and stay in your room.' Of course I knew nothing about such things. I says.' I think if you will give me time to get some of my friends I could do that.' Mr. Stone called him out in the hall and they stayed a few minutes, and he came back and said,' Now if you will promise me that you will be in the police court Monday morning I will let you stay in your room until then; and so he left; and Mr. Stone said he would like to have a conversation with Mrs. Stone, the landlady, in the next room; so he went out and had a conversation with her. I stayed in my room all the next day. I was sick. Mr. O'Brien and other police, man and Mr. Stone were all in my room. No one else was there. Mr. Stone did not come back after his conversation with Mrs. Stone. I stayed until Sunday night, and I went home. It was awfully cold, and I got there at 10 o'clock. Went home alone. My mother met me at the door and said.' What is the matter?' I told here all about it. I told her just what had happened to me: that Mr. Stone had accused me of stealing and how terrible it all was, and I had just felt like I wanted to die. I stayed in bed for almost the first week I was there, and then I was up and down continuously, and then we sent for my brother in Rocky Mount, and he came and we decided to come to Greensboro, and he came to your office. It was the first of January. I don't remember what day of the month. It was on Friday.
"I received $40 a month when I first went with Ellis-Stone. My salary was raised 15 September, 1914, to $45 a month; that was after Mr. Stone had told me he had seen me taking things from the store. I was not required to give any bond to appear Monday morning. I never stole anything from Ellis, Stone Co. "
The witness was sharply cross-examined, and circumstances of the strongest suspicion as to her guilt elicited by counsel, and some things indicating guilt were not very satisfactorily explained by her. *Page 640 
There can be no doubt, if we go no further, that there were (596) repeated and clear violations of the company's rules in regard to clerks taking articles from the store without entering their purchases on tickets provided for the purpose. There was evidence that defendant had caused a warrant to be issued for the plaintiff after this suit was brought.
The testimony in the case was very voluminous, covering many printed pages, and it would be difficult, if not impossible, to go into the numerous details without extending the opinion beyond its proper length. We therefore content ourselves with this statement and such comments upon other matters in the opinion as may be relevant to the questions presented in the record and discussed by counsel.
Judgment was entered upon the verdict, and defendant appealed.
after stating the case: Those facts, which are apparently undisputed in this case, do not impress us very favorably for the plaintiff, but we must remember that she is entitled to have a jury pass upon them, and we are bound by the verdict, if not error in law has been committed at the trial. The verdicts of jurors may not always be right, but no better system has ever been devised for the purpose of deciding the facts than that which we have adopted for so many years. If the jury err, the remedy is with the trial judge, who can set aside the verdict if against the weight of the testimony. Unless this is done, we must accept it, at least, as a correct finding of the facts. The judge refused, in this case, to disturb the verdict, but, on motion of the defendant, he entered a judgment of nonsuit as to the third cause of action relating to the alleged assault, leaving two causes of action — one for slander and the other for false imprisonment. We are not called upon to inquire, and decide, as to the strength of the proof, or the weight of the evidence, for they are matters for the consideration of the jury alone, under the corrective supervision of the judge to avoid a miscarriage of justice. We are aware of the difficulty often presented in making clearly the exact line of division between some and no evidence, but we have no such trouble in this case. The jury having adopted the plaintiff's version of the facts, as against the one advanced by the defendant, the only question is whether we can find in the record any evidence which, if construed most favorably for the plaintiff, will support the finding of the jury.
What was said by the defendant, and imputed to him as slander, was privileged, not absolute, but qualified (Billings v. Fairbanks, *Page 641 139 Mass. 66), and the defendant is protected by this privilege, provided he used it without malice. Bacon v. M. C. RailroadCo., 66 Mich. 166. The words uttered were slanderous, and (597) actionable per se, unless they were true or privileged, and if false, and not privileged, the liability of defendant attaches for having spoken them. Hamilton v. Nance, 159 N.C. 56.
The doctrine of privilege has been often considered by the courts, and has been defined with reasonable clearness. It is a duty which every one owes to society and to the State in which he lives to assist in the investigation of any alleged misconduct and to promote the detection of crime. All information given in good faith in response to any inquiries made with this object is clearly privileged. But this duty does not arise merely when confidential inquiries are made. If facts come under any person's knowledge which lead him reasonably to conclude that a crime has been or is about to be committed, it is his duty at once to give information to the public authorities or to the persons interested, and, therefore, upon grounds of public policy communications which would otherwise be slanderous are protected as privileged if they are made in good faith in the prosecution of an inquiry regarding a crime which has been committed and for the purpose of detecting and bringing to punishment the criminal. All material statements made by the persons interested in the detection of the crime during their investigations and relevant thereto, are privileged. For the sake of public justice, charges and communications which would otherwise be slanderous are protected if made in good faith in the prosecution of an inquiry into a suspected crime. Newell on Slander (3d Ed. ), secs. 595 and 597. In those cases where one person has an interest in the subject-matter of the communications, and the person to whom the communication is made has a corresponding interest, every communication honestly made in order to protect such common interest is privileged by reason of the occasion. Newell on Slander, sec. 623. This Court stated the rule in Harrison v. Garrett, 132 N.C. 176: "Any communication between employer and employee is protected by this privilege, provided it is madebona fide about something in which (1) the speaker or writer has an interest or duty, (2) the hearer, or persons addressed, has a corresponding interest or duty, and provided (3) the statement is made in protection of that interest, or in the performance of that duty. There must also be an honest belief in the truth of the statement. When these facts are found to exist, the communication is protected by the law, unless the plaintiff can show malice on the defendant's part, the burden in this respect being on the plaintiff." The utterance of words actionable per se implies malice, and in the absence of a plea of justification, or when the *Page 642 
plea is set up and the issue is answered against the defendant, the law says that the words are false, and the plaintiff is entitled to recover his damages. Hamilton v. Nance, supra; Ramsey v. (598) Cheek, 109 N. c. 274. But where there is qualified privilege, the plaintiff must go further and show that the defendant was governed by a bad motive, and that he did not act in good faith, but took advantage of the occasion to injure the plaintiff in her character of standing. This privilege applies where the publisher of them alleged slander acted in good faith in the discharge of a public duty, legal or moral, or in the prosecution of his own rights or interests; to anything said or written by a master concerning the character of a servant who has been in his employment; to words used in the course of legal or judicial proceedings; and to publications duly made in the ordinary mode of parliamentary proceedingsWhite v. Nichols, 3 How. (U.S. ) 266. Ours is a case of qualified privilege which has the effect of rebutting the implied malice, upon the presumption that the words were honestly spoken in protection of the speaker's interests, and places the burden upon the plaintiff to show express malice, as we have shown, and whether he has exceeded his privilege, or abused it, by acting with a bad motive, are ordinarily questions for the jury. Gattis v. Kilgo, 140 N.C. 106. Whether the defendant used the words maliciously or with a bad motive must be determined by the jury from all the facts and circumstances, if there is any evidence of the same. While the evidence to support the accusations of dishonesty made against the plaintiff is apparently very strong, we are of the opinion that there is some evidence that the defendant did not act with the best motive, but from a bad motive of spite or malice against the plaintiff. We are not required to say how we would have found as to the fact of plaintiff's guilt or the defendant's motive, but are confined to the simple question, whether there was any evidence as to the latter, however weak it may be, so that it is enough to be considered by the jury. The manner in which the defendant addressed the plaintiff in his office was rude, unnecessary, and uncalled for. Whether she was guilty of shoplifting, or not, she had the right to fair and considerate treatment from one who professed to be acting under a privilege of the law in the honest protection of his interests. There were two men in the room with this woman, who had no one to befriend her or to see that she received fair treatment. Defendant accused her roughly of taking goods without number, and told her there was no use in trying to explain, and asked her "to square herself around here at this desk, and write down for me on paper a few of the things that you have taken. I don't hope for you to remember all of them. It would be impossible." She said, in reply: *Page 643 
"Mr. Stone, if you think now that you are going to get me to square myself and write down on paper for you things that I have not got, I am not going to do it. You nor a regiment like you could not make me do that." Then he got mad and said: "Well, I did not know you would get bigoty and uppish about it, but thought you would be willing to confess the matter. Don't you know what this means to you if you don't do it? Don't you know I will (599) have to call an officer and have your room searched, and that will be embarrassing to you and to the people with whom you are living, and you will have to go up and stay in jail all night, and in the morning it will come out in big headlines in the paper, and your people in Sanford will hear of it, and you will be branded as a thief the rest of your life?" And plaintiff said: "Mr. Stone, I have done all I can to explain." He got up and called John Stone, and said: "John, call an officer. Miss Riley don't think we are giving her a square deal." Plaintiff testified: "I stayed there a few minutes, and an officer came in. I later learned it was Mr. McCuiston. Mr. Stone said: `We have a girl here who has been stealing goods away from the store, and I want to have her room searched.'" The treatment of the plaintiff in her room, when search for the goods alleged to have been stolen was being made, exceeded any privilege of the law under which defendant claims protection, and was evidence of an ulterior motive in charging her with the larceny. His slurring remarks about her extravagance, and the much more serious imputation or insinuation against her chastity — for the jury might infer that this was his meaning — were not, to say the least, germane to the object of the search. His general conduct and demeanor through out the transaction in the store and in her room were indicative of a feeling of resentment against her.
There are other circumstances of equal importance in deciding whether there was any evidence of malice or a wrong motive, but we will refer to only one part of the testimony in this connection. Elmer Shields testified: "I saw Mr. Stone Monday morning. He called me up to his office and said he understood I didn't think he had treated Miss Riley right. I told him no, I didn't think he had given her a square deal. He said he didn't think he had — he ought to have turned her over to the officer and had her locked up. "This is not the language of a man who is acting within the bounds of his privilege. Finally, the plaintiff brought this suit, and almost immediately following this act on her part the defendant caused a warrant for larceny to be issued against her. It is strange that he did not prosecute her upon the evidence he had collected before he detained her in the store. If he had done so, and she had sued him for malicious prosecution, the alleged evidence upon which he based *Page 644 
his accusations against her when in the store, if true, would have exonerated him, as it would have constituted probable cause. The jury had the right to consider the issuing of the warrant as a retaliatory measure, and it is evidence of the state of his feelings toward the plaintiff. The charge against the plaintiff that she had pilfered the store was justified only so far as it was made in good faith and was required for the protection of the defendant and the public, and for the purpose of bringing the plaintiff before the bar (600) of justice to answer for the crime, and the questions whether the defendant has acted in good faith, or has not exceeded his privilege, are for the jury. Gassett v. Gilbert, 72 Mass. (6 Gray) 94. The privilege imports that the words are uttered in legal proceeding, or on some other occasion of apparent duty which primafacie imports that the party was actuated by a sense of duty, and not by the malice which is generally to be implied from speaking words imputing a crime to another. There can be no doubt that the accusation had a direct tendency to hold the plaintiff up to public reproach and disgrace, and was therefore actionable, unless it falls within the class of communications or statements usually termed privileged — that is, authorized by law — not withstanding they may injuriously affect private character. The law regards the publication is of all defamatory matter which is false in fact as malicious, and affords to the party injured a remedy in damages therefor. This is the general rule. But there are cases which constitute an exception to it. These are, when the cause or occasion of the publication is such as to render it proper and necessary for common convenience and the general welfare of society that the party making it should be protected from liability. In such cases the occasion rebuts the inference of malice, which the law would otherwise draw from an unauthorized publication, and renders it necessary for the party injured to show malice, or, as it is sometimes called, malice in fact, as an essential element in support of his action. "A publication `fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs in matters where his interest is concerned,' comes within the class of privileged or authorized communications. A party cannot be held responsible for a statement or publication tending to disparage private character, if it is called for by the ordinary exigencies of social duty, or is necessary and proper to enable him to protect his own interest or that of another, provided it is made in good faith and without a willful design to defame. This general statement of the doctrine on this point seems to be consonant with sound principle, and is supported by numerous authorities." Gassett v. Gilbert, supra, and cases therein cited. We have not considered the fact that the *Page 645 
charges were found by the jury to be false, as evidence sufficient to show express or actual malice, but have followed in that respect the rule laid down by this Court in Ramsey v. Cheek, 109 N.C. 274. Nor have we laid much stress on what John Stone did as floor manager of the store, because not urged in argument, and as we are convinced that there is evidence of ratification of his acts, and approval of his acts is equivalent to prior authority to do them. Horton v. Hensley,23 N.C. 163; Daniel v. R. R., 136 N.C. 517; Cooley on Torts, pp. 127, 214. as this is a motion to nonsuit, and the charge of the court is not before us, we must assume, in the absence of it, that the court gave proper instructions upon the evidence, as error (601) is not to be presumed. In re Smith's Will, 163 N.C. 464. The liability of the master for the tort of his servant is discussed inDaniel v. R. R., supra; Jackson v. Telegraph Co., 139 N.C. 347;Flemming v. Cotton Mills, 161 N.C. 436; Garretson v. Duenkel,50 Mo. 104; Wood on Master and Servant, secs. 288, 294.
The contention that there was no evidence of a false imprisonment cannot be sustained. This term has been variously defined, as will appear by the following references to it, taken from the textbooks: "False imprisonment is the unlawful and total restraint of the liberty of the person. The imprisonment is false in the sense of being unlawful. . . . The right violated by this tort is `freedom of locomotion.' It belongs, historically, to the class of rights known as simple or primary rights (inaccurately called absolute rights), as distinguished from secondary rights, or rights not to be harmed. It is a right in rem; it is available against the community at large. The theory of the law is, that one interferes with the freedom of locomotion of another at his peril. . . . Unlawful detention by actual physical force is unquestionably sufficient to make out a cause of action. Unnecessary violence in an otherwise justifiable arrest may give rise to it. Actual physical contact with the person of plaintiff is not, however, essential. Battery often accompanies arrest, but this is incidental only. Force is essential only in the sense of imposing restraint. . . . The essence of personal coercion is the effect of the alleged wrongful conduct on the will of plaintiff. There is no legal wrong unless the detention was involuntary. False imprisonment may be committed by words alone, or by acts alone, or by both; it is not necessary that the individual be actually confined or assaulted, or even that he should be touched." 19 Cyc., PP. 319 and 323. "Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment. . . The essential thing is the restraint of the person. This may be caused by *Page 646 
threats, as well as by actual force, and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force, and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty as by prison bars. . . . The true test seems to be, not the extent of the restraint (Where the interference amounts to a restraint), but the lawfulness thereof." 11 Ruling Case Law, pp. 793 and 794. "It is not necessary to constitute false imprisonment that the person restrained of his liberty should be touched or actually arrested. If he is ordered to do, or not to do, the thing; to move, or not to move, against his own free will, if it is not left to his option to go or stay where he pleases, and force is offered, or there (602) is reasonable ground to apprehend that coercive measures will be used if he does not yield, the offense is complete upon his submission. A false imprisonment may be committed by words alone, or by acts alone, or by both, and by merely operating on the will of the individual, or by personal violence, or both. It is not necessary that the individual be confined within a prison or within walls, or that he be assaulted. It may be committed by threats. "Martin v. Houck, 141 N.C. 317; Voorhees on Arrest, secs. 274, 275, 276. The language here was: "I said, `I am sick; my back is hurting me so bad I don't know what to do. Well, it is 7 o'clock most; suppose I got to supper? John had already told me that his father would be in on the 7:10 train, and that he would see me; so I asked him to let me go to supper.' `No, you cannot go to supper; you will have to stay here until the "boss" comes.'" This language would indicate that when plaintiff was told that she could not go to supper, but must stay there, after she had stated that her back was hurting her, that there was actual restraint upon her "freedom of locomotion." She wanted to leave for two reasons — because she was suffering with her back, and because it was her hour for supper. Notwithstanding these two good reasons for leaving the room, she did not quit the place after being told that she could not go, but must stay where she was at the time. When ordered to remain where she was, she submitted to the command, though she had two good reasons for leaving and wanted to go, and no doubt she would have gone had she thought herself free and untrammeled to do so. It is quite certain that she would have done so. Her language is: "I was told that I could not go, but that I would have to stay; so I stayed. " This language means that her reason for staying was the order from John Stone. The word "so" is defined as "the case being such," "therefore," or "for this reason," and was used by her in that sense, as if she had said "He told me I could not go, but must stay, and for this reason I stayed." She gives as her reason for not going, that *Page 647 
he virtually ordered her not to leave, which implies clearly that she was coerced by what had been said to her, and thought that her freedom to act as she desired had been restrained or taken away. But the conduct of the defendant, after he entered the room, with his threats and intimations, and circumstances attending his inquiries as to the thefts, the order for a policeman with a warrant to search her room, after she had said, "I don't want my room searched if there is any other way," what he said to her in her room, and what the policeman said in his presence and hearing, all tended to show intentional and actual restraint of her person. "Get yourself ready," said McCuiston to her; "you will have to go up to the police headquarters with me tonight. I will promise not to put you in jail; that is what I ought to do, but I will promise not to do that. It is a mighty bad night, and you can stay in the police office. There is a chair there, and a couch, and you can be fairly comfortable." In reply to which, the plaintiff testified: "I (603) said, `Is it as bad as that? Isn't there any way in the world I could arrange to stay in my room?' He said, `You can give bond and stay in your room.' Of course, I knew nothing about such things. I said, `I think, if you will give me time to get some of my friends, I could do that.'" The action of the parties seems to have impressed her with the belief that she was under compulsion to stay where she was until it suited their pleasure to release her. The proper thing to have done was to have secured a warrant of arrest in the beginning, if the defendant thought that his evidence, already accumulated, was sufficient to show guilt on her part. The case would then have been tried on its own merits, and involved simply the question of her guilt, or rather of probable cause for the accusation, unmixed with malice or other elements calculated to prejudice the defendant in any controversy with her. They ordered her to appear at the police court Monday morning, which she did not do, but they took no further steps to prosecute her — why, does not appear, unless defendant's confidence in his case had abated.
Our conclusion is, that there was evidence of malice, or wrong motive, under the count for slander, and of false imprisonment, under the other count. The plaintiff may be guilty, not withstanding the verdict, but we must accept the latter as conclusive on the truth of the matter.
No error.
Cited: S. v. Publishing Co., 179 N.C. 723; Elmore v. R. R., 189 N.C. 668;Rhodes v. Collins, 198 N.C. 25; Stevenson v. Northington, 204 N.C. 694;Parrish v. Mfg. Co., 211 N.C. 10; Hoffman v. Hospital, 213 N.C. 670:Parker v. Edwards, 222 N.C. 77; Chambers *Page 648 v. Chambers, 235 N.C. 751; Jones v. Hester, 260 N.C. 269;Hales v.McCrory-McLellan Corp., 260 N.C. 570.