STACY, C. J., dissenting; VARSER, J., not having heard this case, did not take part in the decision.
The plaintiff who had been an employee for 29 years of defendant company, as flagman, baggage master, freight conductor and finally as a passenger conductor, brought this suit against defendant company for slander.
The first cause of action is as follows: "That on or about 2 October, 1923, the defendant company, through C. M. Cobb, its superintendent, unlawfully and maliciously said and published of and concerning the plaintiff in the presence of one C. M. Starke, and others, the following false and defamatory matters in substance, to wit: "That the said plaintiff did in many instances while acting as passenger conductor for defendant as aforesaid take up tickets on his train and not punch and report said tickets to the company as it was his duty to do, but took said tickets unpunched and in collusion with the agent at Norfolk, Va., resold them and appropriated the proceeds, or a part thereof, to his own use." *Page 660 
The second cause of action is as follows: "That on or about 2 October, 1923, the defendant, through C. M. Cobb, its superintendent, unlawfully, falsely and maliciously uttered and published of and concerning the plaintiff, in the presence of one C. M. Starke, and others, the following false and defamatory slander in substance, to wit: That the plaintiff had theretofore, while acting as passenger conductor of the defendant company, taken cash fares received by him on the train from passengers and appropriated said cash fares to his own use instead of turning the same in to the railroad company as was his duty so to do."
The defendant answering the first cause of action, says: "Article 3 of the complaint is not true and is denied. But, if defendant company's agent and employee, C. M. Cobb, had said the things which are imputed to him, as having been said to C. M. Starke, and others, which is denied, the same are privileged communications for that the said C. M. Cobb was and is superintendent of the Norfolk district of defendant company, and, as such superintendent, had an interest or a duty in the matter under discussion, or alleged to have been communicated for that it came within the duties delegated to and to be performed by his office and position. And said C. M. Starke was at the time the ticket agent of defendant company at Norfolk, Va., and is the person or individual referred to by plaintiff in his complaint as being in collusion with plaintiff. As such person, individual and agent, the said Starke has a very vital corresponding interest or duty in and about the matter alleged to have been communicated. The alleged statement or communication, if made, was in protection of said Cobb's interest or in the performance of his official duty as superintendent aforesaid."
The defendant's answer to the second cause of action is the same as the answer to the first cause.
The issues submitted to the jury and their answers thereto were as follows:
"1. Did the defendant maliciously speak of and concerning the plaintiff in substance, the words alleged in the first cause of action in the complaint? Answer: `Yes.'
"2. If so, what damage is the plaintiff entitled to recover? Answer: `$10,000.'
"3. Did the defendant speak of and concerning the plaintiff in substance the words alleged in the second cause of action set out in the complaint? Answer: `Yes.'
"4. If so, what damage is the plaintiff entitled to recover? Answer: `$10,000.'"
C. M. Starke, for plaintiff, testified, in part, as follows:
"My name is C. M. Starke: I live in Norfolk, and have lived there six years. Prior to 2 October, 1923, I was ticket agent for the Atlantic *Page 661 
Coast Line Railroad Company at York Street Station, Norfolk. I know C. M. Cobb, who at the time was superintendent of the Norfolk Division of the Atlantic Coast Line Railroad Company, and my office was in his jurisdiction. On 2 October, I was notified by Mr. Cobb to report to his office at 9 o'clock. He told me Captain Elmore was to be let out of the service at Rocky Mount, and he said it was on account of Captain Elmore's collecting tickets and not punching them and turning them in, but that he put them back to be resold by me and we divided the proceeds. Captain Elmore never returned any unpunched tickets to me to be resold; I never divided any proceeds from such tickets being resold. He told me Captain Elmore had been called up to his office twice before that about cash fares; that the last time he was up there he had told him his cash fares did not come up to and correspond with the other conductor's; that soon after he had this talk with him and after that other time, that the cash fares commenced to pick up and he supposed that was the time he commenced taking his tickets up. In respect to this conversation Mr. Cobb again talked to me about the 15th I think it was. He called me up over the telephone and said he wanted to see me and asked me to come to his office. I went to his office and he told me he had said something about Captain Elmore in our other conversation and asked me if I had said anything about it to Captain Elmore, and I said `No,' and he said he was glad of that, because he thought may be I said something about it, and he was glad because he had been `shooting off his lip' or his mouth or something. I had no conversation with him at a subsequent time."
The plaintiff then offered evidence of about 75 witnesses from all over Eastern North Carolina and parts of Virginia, as to his good character, and also several witnesses as to the good character of the witness, Starke, and rested his case.
C. M. Cobb, for defendant, testified, in part:
"I was born near Tarboro, N.C. at Mildred; am 57 years old; have lived part of the time at Mildred, Tarboro and Norfolk; have been working for the Coast Line Railroad nearly thirty-three years; have held the position of flagman, baggage master, freight conductor, conductor on passenger trains, trainmaster and superintendent. When I was trainmaster I lived in Tarboro; when promoted to superintendent of the division I lived in Norfolk. As superintendent, my duties involved the investigation of matters such as we have been discussing here. I first had knowledge that Captain Elmore was under investigation when I was notified to investigate Agent Starke the day before, 1 October, 1923. The police department did the investigating. W. W. Morrison was chief of that department. I had no knowledge whatever that the investigation was being made. I had nothing whatever to do with the *Page 662 
initiation of the investigation. I received my knowledge from Mr. W. H. Newell, General Superintendent, that the investigation of Elmore was being made. He called me to his office on 1 October, and showed me a bunch of affidavits, giving me the duplicates of those he had, and told me — my first knowledge was when the superintendent called me to his office, and he showed me these various affidavits giving me duplicates, and he keeping the originals, which brought out the fact of the irregularity in handling of tickets. That was the first day of October, 1923. I took those affidavits home. They came from the police department, Mr. Morrison's department. I had instructions to take these affidavits and have Ticket Agent Starke in Norfolk to come to my office and go over the same with him. These affidavits were sixteen in number. As these affidavits had reference to irregularities between C. M. Starke and Conductor Elmore, I handled according to instructions. I had Starke to come to my office on the morning of the 2d, at nine o'clock, went over the affidavits with him in detail, the affidavits which I had, showing what each man said he had done. (The court admitted the above testimony of Cobb to show good faith and want of malice.) . . . Elmore was involved in various affidavits showing that tickets were bought from Starke, used on Elmore's train, and were brought back to Starke and he sold them again. Some tickets showed they had been bought twice. I don't know as I could tell you exactly how many had been returned by other conductors. I don't remember, but the affidavits will show. These tickets were all numbered. When the conductor took up these tickets he was required to punch them and surrender them. Each conductor has an individual punch, showing the different marks and from it you can tell which conductor made the punch. . . . No reference was had to cash fares. Captain Elmore's name was not mentioned at all, except when I asked if any one other than he and Captain Elmore had been involved with respect to the irregular handling of tickets. No other reference was made to Captain Elmore in that conversation. I did not say anything to Mr. Starke about the cash fares. I was present when an investigation was held in the office of Mr. Newell, at Captain Elmore's request. . . . I had a second conversation with Starke ten or fifteen days later. I called Starke up that morning and asked if he would come down to the office, as I wanted to see him and have a talk with him. He came in and wanted to know what I wanted. I said, `I want to know if you will sign a statement in reference to the things you told me about the other day.' He remarked, `I haven't told you anything.' He seemed mad and in a very different attitude altogether from the first time. There was nothing about my `Shooting my mouth off.' Nothing of the kind occurred *Page 663 
because of his attitude in the beginning. I could see he was very rebellious. Nothing of the kind occurred. The affidavits upon which I acted and upon which I was making the investigation were furnished me by Mr. Newell, the general superintendent. I had absolutely nothing to do with procuring them. In the course of this conversation nobody's name was mentioned as involved in this matter except Captain Elmore and Mr. Starke. In making this investigation I was performing my duty simply and solely as an official of the company. I had no feeling of animosity towards Elmore at all. I didn't know he was involved in these affidavits until 1 October. I took action then pursuant to instructions. There would not have been any investigation except under the directions of the general superintendent, upon these affidavits. I remember the names of some of the gentlemen who made the affidavits."
W. H. Newell, testified for defendant, in part:
"Mr. Cobb is superintendent of the Norfolk District, and I am general superintendent. My division is from Richmond, Va., to Augusta, Ga., and western part of South Carolina. My division lies in three different states, Virginia, North Carolina and South Carolina. I have known Mr. Cobb ever since he has been in the service. I think about thirty years. I gave him his first job on the railroad. He started as flagman and worked his way up. He has been superintendent of the Norfolk district for five or six years. As such superintendent he would not be expected to investigate matters except when the police department had made investigation and made report to the general superintendent for such action as he might take. All investigations of this kind are made by the police department. When I came into possession of these affidavits we have been referring to I called Mr. Cobb to come to my office and we went over all of these affidavits, and we arranged that he should call Mr. Starke, the ticket agent in Norfolk, to his office, and I was to call Conductor Elmore to my office simultaneously, which I think was done at 9:30 the morning of 2 October and I showed these affidavits to Mr. Cobb when he came to my office. I gave them to Superintendent Cobb, the copies, and he was to call Starke to his office and I was to call Conductor Elmore to my office at the same time. The import of these affidavits was that Starke and Elmore had been charged with irregular handling of tickets sold at the Norfolk Agency and were involved in these affidavits we had. The affidavits were that the agent at Norfolk was selling tickets two or three different times for various trains and that tickets had been returned to Norfolk for resale uncanceled. The affidavits were that tickets had been sold by the Norfolk agent some more than twice and the parties buying them had ridden the trains and they were not turned in to the auditor as provided for *Page 664 
by the rule, but had come in on later or subsequent trains by different conductors under different punch marks, and that there were as many as four or five conductors who had turned in these tickets with their own punch that had been purchased on certain dates previous for Captain Elmore's train."
On cross-examination, he said, in part:
"Subsequent to the conversation I had with Mr. Cobb, Captain Elmore was called to my office. I had him in my office on 2 October, at the same time that Starke was called to Mr. Cobb's office. He asked for an investigation several times after he had been dismissed from the service. I think in about five or six days after the 2d of October he asked for another investigation. I took him off the train on the 2d day of October, and ordered him to come to my office; took him off the train and put somebody else in his place to run the train. He was not formally discharged until five or six days later. He requested an investigation under the rules under which he was working, and when he requested it we were willing to give it to him. Mr. Cobb was not in my office as a witness."
REBUTTAL EVIDENCE
Capt. J. G. Elmore, the plaintiff, testified, in part:
"I am fifty-two years old. I was born and raised at Mt. Olive, Wayne County. I have been in the service of the railroad twenty-nine years. Before that I taught school and worked in telegraph office a year. I have been with the A. C. L. Railroad twenty-nine years. I first worked in the telegraph office, then flagman, baggage master, freight conductor and passenger conductor. I was passenger conductor on 2 October, 1923, and ran between Rocky Mount and Norfolk and Goldsboro and Norfolk. I would make one trip for a week night run to Rocky Mount, and then for two weeks through to Goldsboro on different trains. One week I would work the night run to Rocky Mount and then two weeks I would have the day run to Goldsboro. We would alternate upon the trains running from Norfolk to Rocky Mount and Goldsboro. I have been passenger conductor since 1912, extra passenger conductor since 1910. About fifteen years ago Mr. Cobb came to me one morning and said he was going to report me to the Masonic Lodge. I was a member of the Masonic Lodge at Weldon. He said, `I am going to report you to the Masonic Lodge about some remarks respecting me as to some remarks about Mrs. ____________ and me,' because I did not go to him first about it. Said he understood I had made some remarks about him and agent _______'s wife, that he had had improper relations with her or had made improper advances to her. He said it to me twice. He said he was going to report me to the Masonic Lodge, and I told him he could do so, *Page 665 
it was already known to the Masonic Order. He first stated that the first he knew of it was the day before when Sinclair had told him that I had made the remark that if the reports were not true, some one ought to go to him and tell him about it, and that if it were true his face ought to be broken. Then he said that he hadn't slept any for several nights, that it worried him so, and that he had sent his wife to Norfolk to keep her from finding it out. He said Sinclair had told him the day or night before was what he first told me. He said that Sinclair told him that I had said if it were true his face ought to be broken, and if it were not true somebody ought to tell him." He further stated: "Mr. Cobb has acted very indifferent and cold towards me since that time," etc. . . . "I never took up tickets on my train and didn't turn them in, and didn't have a collusion with Starke to resell the tickets and divide the proceeds. I never took up a ticket and failed to return it to the company. Mr. Cobb did have me there and asked me some questions about cash fares. I remember once he asked me in Norfolk why it was that some of the other conductors turned in so much more cash fares than I did. I told him the reason was that I did not run Saturdays. I laid off on Saturdays every time I possibly could, and Saturdays and Mondays are the highest days. There are more cash fares taken up on Saturday and Monday than on other days. In addition to that many of the passengers had been using mileage and some reported that in as cash fares. We had no regulations for handling as such, and I did not do it. Saturdays the crowds are going home to spend Sunday, and Monday they are returning. Saturday and Monday have the heaviest travel of any other day of whole week through. I lay off every Sunday that I could so that I could spend the day with my family. My family lived in Norfolk. . . . At the time he asked me about my cash fares as compared to the other conductors and I gave him an explanation he seemed satisfied about it. I thought he was until I was told about what he said about it to Starke. That happened a couple of years ago. I thought that my explanation of the matter had satisfied him. . . . When this matter occurred these various reports were made out in the form of affidavits and Mr. Newell read them to me. He called me to his office and nobody was present but he and I. He asked me to make explanation and I told him it was just like a clap of thunder out of a clear sky. I was very much surprised."
He denied that he took up tickets and didn't turn them in and denied collusion with Starke to resell the tickets and divide the proceeds. He denied that he collected cash fares and never turned in the money.
The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones and other necessary facts will be considered in the opinion. *Page 666 
It will be noted that plaintiff alleges two causes of action of slander against the defendant:
(1) That defendant falsely and maliciously published of and concerning plaintiff "That the said plaintiff did in many instances while acting as passenger conductor for defendant as aforesaid take up tickets on his train and not punch and report said tickets to the company as it was his duty to do, but took said tickets unpunched and in collusion with the agent at Norfolk, Va., resold them and appropriated the proceeds, or a part thereof, to his own use."
(2) That defendant falsely and maliciously published of and concerning plaintiff "That the plaintiff had theretofore, while acting as passenger conductor of the defendant company, taken cash fares received by him on the train from passengers and appropriated said cash fares to his own use instead of turning the same in to the railroad company as was his duty so to do."
The defendant denied the allegations of the complaint, and sets up the defense of privileged communication. If defendant's agent said the things imputed to him as having been said by C. M. Starke, they were privileged communications and in the performance of his official duty as superintendent of defendant company. The conversation with Starke was a publication. Hedgepeth v. Coleman, 183 N.C. 309.
C. M. Starke, witness to whom the publication was made, testified that the charges were made by C. M. Cobb, superintendent of defendant company in one conversation on 2 October, 1923. The question arises, can plaintiff have two causes of action growing out of one conversation? We think not. There can be but one recovery.
From a careful examination of the authorities, we find that it is laid down in Estee's Pleadings (4 ed.) sec. 1717, as follows: "A count of a petition in an action for slander, which sets out the entire conversation in which the slander was spoken, contains only one cause of action, although the conversation consists of several parts, each of which is actionable."
The same principle is stated in Maxwell on Code Pleadings, p. 352: "When there are different sets of words, spoken at a particular time, although they charge distinct offenses, there will be but one cause of action. The rule, in case of torts, being that each trespass or conversion or fraud gives a right of action, and but a single one, however numerous the items of the wrong or damage may be." *Page 667 
In Cracraft v. Cochran, 16 Iowa, p. 304, it was said: "It is true that the words set out in the petition charge the plaintiff, in effect, with two offenses, one of store breaking (Rev., sec. 4235) and the other of larceny (Rev., sec. 4237); but such charges were, as appears by the petition, made in the same conversation and at the same time, and of course gave but one right of action. It is well said by Strong, J., in Secor and others v.Sturgis and others, 16 N.Y. 548, that `in the case of torts, each trespass, or conversion, or fraud, gives a right of action, and but a single one, however numerous the items of wrong or damage may be.' Under this rule, it matters not how numerous were the offenses charged in the same conversation; they, together, constitute but one cause of action. A plaintiff could not sue and recover for one of the slanderous charges specified, and then bring another action for another of the slanderous charges made in the same conversation; for the reason that he has but one cause of action growing out of the same conversation, although the items of slander were numerous. To allow a party thus to bring several causes for the same slanderous course, would be to sanction the splitting of actions, which both the common law and The Code prohibits." Galligan v. Sun Prtg. Pub. Assn., 54 N.Y., Supp. p. 471; Thompson v. Harris, 91 Am. St. Rep. p. 187; (64 Kan. 124); Macdougall v. Knight, 25 Queens Bench Div. p. 1.
Plaintiff in his brief says: "The plaintiff conceded at the trial, and concedes now, that the language charged in the first cause of action was qualifiedly privileged, but insists that there was evidence of actual malice sufficient to destroy the privilege. . . . The words alleged in the first cause of action were qualifiedly privileged and not actionable unless the plaintiff has shown actual malice." We think this proposition of law so sound and well settled that actual malice must be shown where the cause of action is qualifiedly privileged, that we do not cite authorities.
But defendant in its answer contends that the communication was privileged. We think it was qualifiedly privileged. The matter of absolute privilege is well stated in Newell Slander and Libel (4 ed.), sec. 350, as follows: "In this class of cases it is considered in the interest of public welfare that all person should be allowed to express their sentiments and speak their minds fully and fearlessly upon all questions and subjects; and all actions for words so spoken are absolutely forbidden, even if it be alleged and proved that the words were spoken falsely, knowingly and with express malice. This rule is, however, confined to cases in which the public service or the administration of justice requires complete immunity — for example, words spoken in legislative bodies, in debates, etc., in reports of military officers on military matters *Page 668 
to their superiors; words spoken by a judge on the bench and by witnesses on the stand. In all such cases the plaintiff cannot be heard to say that the defendant did not act under the privilege, that he did not intend honestly to discharge a duty, but maliciously availed himself of the occasion to injure his reputation." Qualified Privilege, sec. 389:
"In the less important matters, however, the interests and welfare of the public do not demand that the speaker should be freed from all responsibility; but merely require that he should be protected so far as he is speaking honestly for the common good. In these cases the privilege is said not to be absolute but qualified; and a party defamed may recover damages notwithstanding the privilege if he can prove that the words were not used in good faith, but that the party availed himself of the occasion wilfully and knowingly for the purpose of defaming the plaintiff. In this class of cases it will be convenient to divide the occasions into four classes:
"(1) Where the circumstances of the occasion cast upon the defendant the duty of making a communication to a certain other person to whom he makes such communication in the bona fide performance of such duty.
"(2) Statements made for the protection of private interests.
"(3) Where the defendant has an interest in the subject-matter of the communication, and the person to whom he communicates it has a corresponding interest.
"(4) Reports of the proceedings of courts of justice and legislative bodies."
Pearson, J., in Brooks v. Jones, 33 N.C. p. 260, defines malice: "General malice is wickedness, a disposition to do wrong, a `black and diabolical heart, regardless of social duty and fatally bent on mischief.' . . . Particular malice is ill-will, grudge, desire to be revenged on a particular person." S. v. Long, 117 N.C. p. 799; S. v. Knotts,168 N.C. p. 184.
The plaintiff, to show actual malice, relies upon an unpleasant circumstance between himself and the witness Cobb some 15 years before the trial of the cause, and incidents since testified to — his viewpoint of Cobb's attitude towards him, slight and trifling.
In Lewis v. Carr, 178 N.C. p. 580, it was said: "in cases of qualified privilege the falsehood of the charge will not of itself be sufficient to establish malice, for there is a presumption that the publication was made bona fide. Fields v. Bynum, 156 N.C. 416; Gattis v. Kilgo, 140 N.C. 106;Ramsey v. Cheek, 109 N.C. 270." Harrison v. Garrett,132 N.C. p. 176; Riley v. Stone, 174 N.C. 588; 17 R. C. L., p. 322, par. 65. *Page 669 
Newell Slander and Libel (4th ed.) part sec. 280, is as follows: "The question of malice or no malice is for the jury. The presumption in favor of the defendant arising from the privileged occasion remains till it is rebutted by evidence of malice; and the evidence merely equivocal, that is, equally consistent with malice or bona fide, will do nothing towards rebutting the presumption. The facts tendered as evidence of malice must always go to prove that the defendant himself was actuated by personal malice against the plaintiff."
Under the facts and circumstances of this case, to destroy the qualifiedly privileged communication set forth in what is termed the first cause of action, we do not think the evidence of actual malice sufficient. The case in the court below was tried out on the theory that the plaintiff had two causes of action from the one conversation, but under the law there could be but one cause of action and one recovery. The issues were submitted on two causes of action for the one conversation and the contest waged and the verdict rendered on these issues unexcepted to by either party to this action. We do not think under such circumstances, although two alleged causes of action are set forth in the complaint as arising out of the one conversation, that a new trial should be granted, but that the allegations comprising what is denominated the second cause of action should be considered and determined on the record. This under plaintiff's evidence, taken to be true, is the only charge in the one conversation on which recovery can be had. As stated, if the action had been brought for the one conversation only one recovery could be had on the allegations in the two causes of action set forth in the complaint, but the first cause alleged in the complaint, from the view we take of the evidence, was qualifiedly privileged and no actual malice shown — no recovery could be had.
The conversation on which recovery can be had is on the charge of taking cash fares — embezzlement or misappropriation, excess of privilege. This being true, the present action, denominated the second cause of action, can be determined on the record. Our liberal practice permits this. Under the facts and circumstances of this case, no exception being made to the issues, the first cannot be sustained — the second can.
As to the second cause of action, C. M. Starke, testified that C. M. Cobb, division superintendent of defendant, in the conversation "Told me Captain Elmore had been called up to his office twice before that about cash fares; that the last time he was up there he had told him his cash fares did not come up to and correspond with the other conductors'; that soon after he had this talk with him and after that other time, that cash fares commenced to pick up and he supposed that was the time he commenced taking his tickets up." *Page 670 
The defendant in the argument said: "At the outset, the attention of the court is respectfully directed to the vast difference between the language of the witness and that of the complaint as to the second cause of action."
The court below, on this aspect, we think, in a clear and accurate charge laid down the rule of law: "The third issue is, did the defendant speak of and concerning the plaintiff the words alleged in the second cause of action — that is the witness, Starke, testified that Cobb told him that Captain Elmore had been called up to his office twice before that about cash fares; that the last time he, Elmore, was up there, he was told by Cobb that his cash fares did not come up to and correspond with the other conductors; that soon after he had this talk with him and after that other time, that the cash fares commenced to pick up and he supposed that was the time he commenced taking his tickets up. Now, gentlemen of the jury, if you find from the evidence and by its greater weight, that the agent, Cobb, used that language on that day, and he thereby intended to charge Elmore with appropriating to his own use the cash fares, it would be your duty to answer the third issue `Yes'; if you do not so find, you should answer it `No.' That would not be a privileged communication, because he did not have instructions from his superior, Mr. Newell, to have anything to do or say about cash fares being taken, and that would not be a qualified privileged communication, and, if you find that he did use the language and thereby intended to have it understood that Elmore had collected and appropriated to his own use cash fares, you should answer the third issue `Yes'; if you are not so satisfied, you would answer it `No.' The evidence of Starke is — that Cobb did use that language, and Cobb says that he did not use it. You have the testimony of the two witnesses as to the language used, and the burden is upon the plaintiff to satisfy you that it was used, and if you find it was used, then you would answer the third issue `Yes,' if you find it was not used, you would answer the issue `No.'"
Newell Slander and Libel (4 ed.) part of par. 267, says: "In all cases of ambiguity it is purely a question for the jury to decide what meaning the words should convey to persons of ordinary intelligence. The question always is: How did the persons to whom the words were originally spoken or published understand them? — the legal presumption being that they were persons of ordinary intelligence. We must assume, too, that they gave to ordinary words their ordinary meaning, to local or technical phrases their local and technical meaning." 17 R. C. L., pp. 312-315, inclusive;Studdard v. Linville, 10 N.C. 474; McBrayer v. Hill, 26 N.C. 139; Pughv. Neal, 49 N.C. 369; *Page 671 McCall v. Sustair, 157 N.C. 179; Cotton v. Fisheries Products Co.,177 N.C. 56; Vincent v. Pace, 178 N.C. 421.
Walker, J., in Beck v. Bank, 161 N.C. p. 206, says: "As to the accusation he made, that plaintiff, H. L. Beck, had embezzled timber or money, was equivalent to charging them with the commission of a felony, or an infamous offense punishable by imprisonment in the penitentiary, `as in cases of larceny' (Revisal, sec. 3406) (now C. S., 4268), the burden is cast upon the defendant to prove the truth of the charge, or any matter in justification or mitigation. Osborn v. Leach, 135 N.C. 628; Ramsey v.Cheek, 109 N.C. 270; Harris v. Terry, 98 N.C. 131; McKee v. Wilson,87 N.C. 300. Malice, which is an essential element of slander, is, generally speaking, presumed where the words are actionable per se, until the contrary is proved, except in those cases where the occasion is privileged or prima facie excuses the publication. This presumption, however, may be rebutted. Newell on Slander and Libel (2 ed.) p. 39 (5) and 319 sec. 12, and cases supra." Ivie v. King, 167 N.C. 174, rehearing denied 169 N.C. 261.
The charge made against the plaintiff and so understood by the jury was that of embezzlement or misappropriation of cash fares — a felony under C. S., 4268. This was actionable per se, and malice is presumed.
If C. M. Cobb's (division superintendent of defendant company) publication to C. M. Starke, as to collusion between plaintiff and Starke as to the tickets, was qualifiedly privileged, no actual malice being shown to destroy the privilege, yet the charge as to cash fares or embezzlement was actionable per se and malice is presumed from the felony charged. Defendant says, in answer to this, that if defamatory language was used about cash fares by Cobb, which is denied, he exceeded his authority and it is not liable.
In 25 Cyc., p. 386, it is said: "That where the party exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defamatory of plaintiff, he will not be protected and the fact that a duty, a common interest or a confidential relation existed to a limited degree is not a defense, even though he acted in good faith." Newell Slander and Libel (4 ed.) sec. 394, in part: "A communication which goes beyond the occasion exceeds the privilege." In some jurisdictions it has been held "that expressions in excess of what the occasion warrants do not per se take away the privilege, although such excess may be evidence of malice for the consideration of the jury." 25 Cyc., 387.
In the present case, the excess is per se actionable, and malice is presumed. It may be under different facts and circumstances — different pleadings and issues, expressions in excess may be evidence of malice, but here malice is presumed from the per se actionable words. *Page 672 
In Ange v. Woodmen, 173 N.C. p. 35, Hoke, J., citing a wealth of authorities, says: "It is now fully established that corporations may be held liable for negligent and malicious torts, and that responsibility will be imputed whenever such wrongs are committed by their employees, and agents, in the course of their employment, and within its scope." Munick v.Durham, 181 N.C. p. 193.
In Cook v. R. R., 128 N.C. p. 336, it was said: "Acting within the general scope of his employment, means while on duty, and not that the servant was authorized to do such acts." Gallop v. Clark,188 N.C. p. 186; Sawyer v. Gilmers, Inc., ante, 7; Southwell v. R. R.,ante, 417;Seward v. R. R., 159 N.C. 241; Cooper v. R. R., 170 N.C. 492; Cotton v.Fisheries Products Co., supra, 59; Jenkins v. Sou. R. R. Co. (S.C.), 125, S.E. Rep., 912.
After the testimony of Elmore, the plaintiff again rested his case, and the defendant then offered as evidence the sixteen affidavits referred to in the testimony of C. M. Cobb and W. H. Newell. This evidence was objected to by plaintiff and the objection sustained, and defendant assigned this as error.
C. S., 542, is as follows: "In an action for libel or slander it is not necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose, but it is sufficient to state generally that the same was published or spoken concerning the plaintiff; and if such allegation is controverted, the plaintiff is bound to establish on trial that it was so published or spoken. The defendant may in his answer allege both the truth of the matter charged as defamatory, and any mitigating circumstances to reduce the amount of damages; and whether he prove the justification on trial or not, he may give in evidence the mitigating circumstances."
Defendant in its answer had the legal right under the statute to set up the plea of justification, to show the truth of the charge. If found true by the jury, plaintiff could not recover. Hamilton v. Nance,159 N.C. p. 59. It did not do this, but relied on, as its defense, privileged communication and denial. It could not offer any evidence to show the truth of the charge nor any evidence which tended to show the truth of the charge. The defendant had already been permitted, for the purpose of showing the good faith of Superintendent Cobb, to prove that he had these affidavits on the occasion of speaking the words, and also to show the names of the persons who made the affidavits and had permitted both Superintendent Cobb and Newell to state the purpose of these affidavits. This was all that was necessary to be shown as a basis of the alleged good faith of Superintendent Cobb. After this was done, the affidavits themselves could only tend to prove the truth *Page 673 
of the charge. It would be noted that the affidavits were not offered until after the plaintiff had closed his evidence in rebuttal and the plaintiff Elmore had been cross-examined as to whether or not he did in fact take the tickets as charged. Then, in sur-rebuttal, the defendant offered these affidavits evidently for the purpose of contradicting his statement as to whether or not he did in fact take the tickets and in reply to his testimony on that point. In Burris v. Bush, 170 N.C. p. 395, it is said: "The statute (Rev., sec. 502) (now C. S., 542), permits a defendant in actions for libel or slander to allege `both the truth of the matter charged as defamatory and any mitigating circumstances to reduce the amount of the damages; and, whether he prove the justification or not, he may give in evidence the mitigating circumstances,' but, in the absence of a plea in justification or mitigation, evidence of the truth of the charge is incompetent. Upchurch v. Robertson, 127 N.C. 128; Dickerson v. Dail,159 N.C. 541."
Newell Slander and Libel (4 ed.) p. 758, part sec. 692, is as follows:"Truth under the plea of the general issue. In most jurisdictions under this plea the defendant cannot be permitted to give in evidence the truth of the defamatory matter, either in bar of the action or in mitigation of damages."
If, in a plea of justification — the truth of the charge had been pleaded, defendant could have produced evidence to sustain the plea allowed it by statute. It could have had the witness at the trial, who made the affidavits, to show the plaintiff's conduct — collusion with the ticket agent Starke to defraud the defendant — but the affidavits were nothing more than hearsay, and incompetent, for any purpose other than to show the good faith of defendant and they had been used and spoken of by witnesses for this purpose. This evidence was addressed to the first cause of action and not now material from the position we take as to that cause.
The final exception and assignment or error we cannot sustain, which is as follows: "For that the court declined to give the instructions prayed by defendant, `The court charges you that in no aspect of this case is plaintiff entitled to punitive damages, or smart money, and the jury in assessing damages, if you reach that issue, will not allow any such damage.'"
The court below charged the jury as to punitive damages: "As to punitive damages, gentlemen of the jury, you are not compelled or required by law to give punitive damages, but that is a matter in your discretion. You may in your discretion award punitive damages for the purpose of punishing the defendant. Punitive damages are punishing damages. Punitive damages are awarded to the plaintiff when he has been maliciously injured by some act or wrong-doing of the defendant, *Page 674 
and the damages are awarded to the plaintiff as a punishment to the defendant. That is entirely in your discretion."
We think, under all the facts and circumstances of this case, the charge was correct and fully sustained in Ford v. McAnally, 182 N.C. p. 419;Baker v. Winslow, 184 N.C. p. 5, and cases cited. There was no separate issue as to punitive damages, and on the record there is no way to ascertain if any of the damages awarded plaintiff were punitive.
The first cause of action alleged in the complaint, for the reasons heretofore given cannot be sustained. The publication was qualifiedly privileged, and no sufficient actual malice shown by the evidence to destroy the privilege.
The second cause of action was brought by plaintiff against the defendant for publication made by defendant's agent of a charge or accusation against him of embezzlement or misappropriation of cash fares — which is a felony. The jury found that the publication made was false, and the words are actionable per se — malice is presumed — and damages were awarded plaintiff. It was in evidence that the plaintiff had been in the employ of defendant company for 29 years and offered evidence of about 75 witnesses from all over Eastern North Carolina and parts of Virginia as to his good character.
Under our statute the defendant could have set up in its answer that the charge was true, the plea of justification. If it had evidence sufficient to sustain this plea and the jury believed it, plaintiff could not have recovered. It denied the allegation, plead privileged communication, and made no plea of justification. It could have in its answer set up mitigating circumstances to reduce damages. It did not do this. The jury by its verdict has said that defendant has falsely and maliciously slandered plaintiff. A cause of action for slander has come down to us from time immemorial. Slander is so hurtful that it is a Proverb: "The words of a talebearer are as wounds." Material things are trifling in comparison with character — "A good name is rather to be chosen than great riches." The record shows that the case was carefully tried in the court below. It has been ably argued here. On the first cause of action a nonsuit should have been granted, and that cause of action dismissed. On the second cause of action, we can in law discover no error.
Error as to first cause of action.
No error as to second cause of action.
STACY, C. J., dissents; VARSER, J., not having heard this case, did not take part in the decision. *Page 675