**H. E. CRAWFORD COMPANY,**
Inc., Appellant,

v.

**DUN & BRADSTREET,**
Inc., Appellee.

No. 7274.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 15, 1956.

Decided Jan. 8, 1957.

6. See Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399.

Stephen Perry Millikin, Greensboro, N. C. (Beverly C. Moore and Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant.

L. P. McLendon, Jr., Greensboro, N. C. (L. P. McLendon, Sr., and Brooks, McLendon, Brim & Holderness, Greensboro, N. C., on brief), for appellee.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and R. DORSEY WATKINS, District Judge.

R. DORSEY WATKINS, District Judge.

This is an appeal by H. E. Crawford Company, Inc. (Crawford), plaintiff-appellant, from a judgment in favor of Dun & Bradstreet, Inc. (Dun & Bradstreet), defendant-appellee, entered by the court after trial, under Fed.Rules Civ.Proc. rule 50(b), 28 U.S.C.A., on Dun & Bradstreet's motion for directed verdict, in an action based upon an alleged libelous credit report.

Crawford is a North Carolina corporation. Since at least 1949 it has been engaged, among other things, in the production of textile knitting machines, knitting machine attachments, and replacement parts. Its most important textile machine permitted machine knitting of argyle socks.[1]

In June 1949 Crawford had entered into a contract with Standard Hosiery

1. Squares or other designs of a single, solid color could be knitted, and the various colors "sutured" or joined by the same machine, instead of hand sutured.

Mills [2] (Standard), under which Crawford produced argyle knitting machines exclusively for Standard, and Standard reimbursed Crawford for equipment for manufacturing the machines, together with the cost of the machines plus 10%, and paid Crawford a royalty [3] of 10 cents per dozen on all socks made by Standard on these machines. Under this arrangement Crawford produced for and sold to Standard 151 argyle machines and received approximately $500,000 in payment for the equipment and machines.

An accounting was reached on August 31, 1951 pursuant to which Crawford executed a note and chattel mortgage to Standard in the amount of $56,017.90, the note being payable in two installments of $28,008.95 with interest, the first being due July 1, 1952, and the second July 1, 1953. The mortgage, in which Standard's attorney, Kenneth W. Young, was named as trustee, was secured by "all the capital, machinery and equipment owned by" Crawford [4] and by additional collateral. [5] On September 2, 1952, the note was in default, with an unpaid balance of $37,598.45. A renewal note for this amount, with the same security, was executed. Crawford was obligated to pay monthly installments of $1,500 and accrued interest beginning November 15, 1952, and a lump payment of $9,234.02 on May 1, 1953. Payments of $9,234.02 and of one installment of $1,500 were made. [6] In June or July, 1953, Standard's attorney discussed the overdue indebtedness with Crawford, and also discussed various possible settlements, including the assignment of amounts to be received on the delivery of various machines being built by Crawford under contracts hereinafter described. On August 6, 1953, Crawford was given written notice that if the unpaid principal and interest of $28,132.47 was not paid by August 10, 1953, legal action would be taken to enforce payment of the balance. No payment was made, and on August 10, 1953, an action was instituted in the Superior Court of Alamance County, North Carolina, to secure a judgment for the balance due. "Claim and delivery" proceedings [7] ancillary thereto were issued with summons directed to the Sheriff of Forsyth County to repossess the machinery and equipment, all of which were located in Forsyth County, listed in the chattel mortgage.

Before the ancillary proceedings were sent to Forsyth County for service, Crawford arranged with Standard to hold up service of the claim and delivery on Crawford's undertaking to make an immediate payment of $7,000 on the indebtedness; to authorize the application against the note of a parts account of $6,663.50 owed by Standard; and to pay the balance of $14,832.50 not later than August 20, 1953. The indebtedness was reduced by the first two amounts, but the balance due August 20th was not paid.

In connection with the renewal note of September 2, 1952, Standard released

---

2. Often referred to as "Roth" in the case.

3. Crawford referred to these payments as royalties, and also testified to having designed and developed the machine. No evidence as to any patent or patent application on the machines was offered, and the weight of the credible evidence is to the effect that a competitive "Hemphill" machine, likewise producing knitted argyle socks, was on the market at least as early as the Crawford machine.

4. Crawford would have been unable to operate without the equipment covered by the chattel mortgage.

5. Stock of H. E. Crawford Mill Supply Company, owned by the Crawford interests.

6. The record is not clear as to when these payments were made.

7. General Statutes of North Carolina, §§ 1-472, 1-474, 1-476. Upon filing "claim [for] the immediate delivery of the property" and upon posting bond in double the value of the property, "the clerk of the court shall * * * require the sheriff of the county where the property claimed is located, to take it from the defendant and deliver it to the plaintiff."

Crawford from its obligation to manufacture argyle machines exclusively for it; and Crawford released Standard from the payment of "royalties" on socks thereafter manufactured by Standard.

Beginning in December 1952 through August 1953, Crawford secured orders for 121 of its argyle knitting machines. Crawford was unable to finance the construction of these machines and accordingly required substantial advances from its customers at the inception of the contracts, far in excess of the 10% deposit required by its competitor. The customers therefore required Crawford to furnish performance bonds.

The following contracts were obtained:

Griffin Hosiery Mills (Griffin), contract dated December 31, 1952, for 30 machines costing $66,000; deposit by Griffin of $50,000; machines to be delivered August 15, 1953;

Bear Brand Hosiery Company (Bear), contract dated January 7, 1953, for 31 machines costing $70,000; deposit by Bear of $50,000; machines to be delivered August 31, 1953;

Harriss & Covington Hosiery Mills (Harriss & Covington), contract dated March 2, 1953, for 30 machines costing $80,000; deposit by Harriss & Covington of $50,000; machines to be delivered August 31, 1953; and

Unique Knitting Company (Unique), contract dated August 11, 1953 for 30 machines costing $78,300; deposit by Unique of $30,000; machines to be delivered December 31, 1953.

The Griffin and Bear Brand contracts were each secured by a $50,000 advance payment performance bond executed by Century Indemnity Company (Century) as surety. The Harriss & Covington contract was secured by a $50,000 advance payment performance bond executed by United States Fidelity & Guaranty Company (U. S. F. & G.) as surety.

Each bond contained indemnity provisions, and each provided that changes in Crawford's financial condition were to be communicated to the surety.

Crawford was unable to secure a corporate surety for the Unique advance payment, and the parties controlling Crawford gave their personal undertakings, secured by collateral.

As of August 19, 1953 Crawford was in default on the Griffin contract; had delivered only 3 of the 31 machines due Bear by August 31, 1953; and had delivered only one of the 30 machines due Harriss & Covington by August 31, 1953.[8]

Dun & Bradstreet is a Delaware corporation, engaged, among other things, in the furnishing to subscribers to its service of commercial credit ratings and reports. In addition to a compilation of ratings, it furnishes reports upon individual companies pursuant to contracts each of which contains the provision that all information furnished "shall be held in strict confidence, and shall never be revealed or made accessible in any manner whatever to the persons reported upon or to any others."

Dun & Bradstreet employs a number of investigators or reporters. It is their duty to investigate any person, firm or corporation assigned to them, and also to check court records and report any suits or judgments against anyone appearing in the Dun & Bradstreet lists. The reporter in Alamance County in checking the court records for that county learned of the claim and delivery proceedings brought on August 10, 1953 by Standard against Crawford. He did not then have any of the reporting forms generally used by Dun & Bradstreet, which permit specific indication as to whether the proceeding is a suit or a judgment. He

---

8. By August 31, 1953, all three of these contracts were in formal default, only

7 of the total of 91 machines then due having been delivered.

copied on plain paper and sent to the Dun & Bradstreet office in Winston-Salem, North Carolina (Forsyth County, where Crawford is located), the following:

"Standard Hosiery Mills, Inc.
"Kenneth W. Young, Trustee,
"Plaintiff
"vs.
"H. E. Crawford Co., Inc.
"Defendant

"H. E. Crawford Co., Inc. defaulted on Promissory Note dated August 13, 1951 and renewal obligation (promissory note) dated September 2, 1952. $37,598.45.

"Wherefore, plaintiff, Standard Hosiery Mills, Inc., prays that it have and recover of the defendant:

"1. The sum of $28,132.47, together with interest at legal rate from and after the date of the institution of this action.

"2. As an ancillary remedy the plaintiff, Kenneth W. Young, Trustee, recover the possession of said personal properties.

"3. That the Court order the sale of the said personal properties by the plaintiff, Kenneth W. Young, Trustee, for the satisfaction of any judgment obtained in this cause and that the plaintiff further recover the cost of this action to be taxed by the clerk."

No contention has been made that this was an inaccurate summary. In Winston-Salem, this was received in ordinary course by one of Dun & Bradstreet's "reporters" who dictated the following report on a transcribing machine:

"Investigation of Guilford County for court records reveal Standard Hosiery Mills, Kenneth W. Young, Trustee, obtained judgment against subject (H. E. Crawford Co., Inc.) in amount of $28,132.47 together with interest from September 1952. Investigation indicates subject has defaulted in pay-ment of a promissory note dated August 13, 1951 and renewal obligation dated September 2, 1952 in amount of $37,598.45. The court has ordered sale of said personal properties of (sic) the plaintiff, Kenneth W. Young, Trustee, for the satisfaction of any judgment obtained in this cause, and that plaintiff further recover the cost of the action to be taxed by the Clerk."

No completely satisfactory explanation for the admittedly erroneous report was given. The reporter had dictated a number of judgment reports that day, and apparently treated this case as one of the series.

On or about August 19, 1953, this report was mailed by Dun & Bradstreet to 43 of its subscribers, each of whom had specially requested credit reports of and concerning Crawford.

At that time, in addition to the situation of Crawford with respect to its contracts for the production of argyle machines, set out above, Crawford was in the following position:

(1) Income taxes with interest, withholding taxes with interest and penalties, and social security taxes, in the aggregate amount of $12,889.11 were due and owing; (2) the Standard note was in default, and Crawford was unable to pay it; (3) Crawford could not meet its next payroll and could not finance its operations; (4) Crawford could not, and for several weeks had been unable to, obtain commercial bonds; and (5) trade accounts of some $23,000 were due.

On September 15, 1953, Dun & Bradstreet was notified by Crawford's attorney of the errors in the August 19, 1953 report. On or about the same day a "retraction notice" was sent by Dun & Bradstreet to each of the 43 subscribers to whom the August 19th report had been sent.

On June 22, 1954, Crawford sued Dun & Bradstreet for the publication of a "false, malicious and defamatory libel."

General allegations of loss and damage were made in the complaint, but without specification of parties or amounts. General and punitive damages were prayed.

Dun & Bradstreet pleaded as special defenses (1) that the August 19, 1953 report was a "mistake * * * innocently made without malice or improper purpose," "made in the ordinary course of business and without any ulterior or malicious motive;" and (2) "that the making and distributing of the report complained of * * * in no way affected the credit or reputation of" Crawford "unfavorably and resulted in no injury or damage to" Crawford.

At the end of the case, after a week's trial, Dun & Bradstreet moved for a directed verdict. The court reserved its ruling on this motion, (F.R.C.P. 50 (b)) and the case was submitted to the jury on special issues. These issues, and the answers of the jury thereto, are as follows:

"1. Was the statement published by defendant of and concerning the plaintiff materially false and libelous as alleged in the Complaint? Answer: Yes.

"2. If so, was the report published through carelessness and heedlessness on the part of the defendant? Answer: Yes.

"3. If so, was the report published with actual malice? Answer: No.

"4. What actual damages, if any, is the plaintiff entitled to recover of the defendant? Answer: $23,750.00.

"5. What amount, if any, of punitive damages is the plaintiff entitled to recover of the defendant? Answer: None."

After the verdict, Dun & Bradstreet renewed its motion for a directed verdict, and in the alternative moved for judgment in its favor notwithstanding the verdict, or for a new trial. The district judge heard argument on the motion, and rendered an opinion. He found as facts that Dun & Bradstreet was under contractual obligation to furnish the August 19, 1953 report to the 43 subscribers to whom it was sent; that they were under contractual obligation to treat the information confidentially; that "the subscribers had an interest in such information and a duty commensurate with the duty imposed on the defendant to supply the information"; and that there was no substantial evidence that Dun & Bradstreet was activated by ill will, "or that it acted in any true sense with a malicious motive or with actual malice."

As to the applicable law, the district court stated that (1) had Dun & Bradstreet "reported truthfully the information in its possession" the occasion would be one of qualified privilege, and Dun & Bradstreet would not be liable in damages, even although the information so published "was false, in the absence of proof that it was published with malice"; (2) where a person "reports facts that are materially contrary to the truth that he has in his possession" it cannot be said to have been "done in good faith, and where such a report is made that is materially and substantially false and particularly if it is done in a negligent, careless and heedless manner, it would not seem necessary in that case to show that it was done with malice, before the aggrieved person would be entitled to damages"; (3) "derogatory financial report concerning a business establishment undoubtedly can be libelous per se and the Court thinks that such a report comes within the category of slander or libel that is slanderous or libelous per se if it adversely affects the credit of a commercial concern"; and (4) that the distinction between the facts stated in the August 19th report and the true facts at the time such report was published "is not sufficient as a matter of law to constitute a (sic) report as being materially different from the true facts, and it is on this theory that the Court

is of the opinion that the motion for directed verdict should be granted."

The Court entered judgment that "the motion for directed verdict should have been and is now granted in favor of the defendant * * *." Dun & Bradstreet excepted "to the failure of the Court in granting the directed verdict to include as a basis for granting the directed verdict the further grounds that the report was privileged and that no malice was shown that would destroy the qualified privilege of the defendant, and to include the further grounds that there was no evidence of damage shown by the plaintiff."

We reach the same result as the district judge, but by a different line of reasoning and upon different grounds.

1. *Difference between true facts and publication.*

■ We are unable to agree with the conclusion of the district court that there was no material difference between the true facts at the time of the August 19, 1953 report, and the alleged facts recited in that report. The question is not simply whether or not at that time Crawford was in a precarious financial condition. Nor is it simply a question of whether the truth would have hurt more (or less) than the publication, assuming that the publication caused any damage to Crawford. An action on a defaulted promissory note, for a judgment for an undue balance of $28,132.47, with ancillary possessory remedies, and with a prayer for an order of sale to satisfy a judgment if obtained, is different from a judgment for $28,132.47, for the satisfaction of which an order of sale has been entered. It is the difference between the mere institution of a suit, and the successful termination of a suit. To us, the difference is a material one.

2. *Qualified privilege.*

■ The delivery of financial information by Dun & Bradstreet, a corporation engaged in the collection and dissemination of such information, to subscribers, and only to subscribers, specifically requesting reports on Crawford, would prima facie fall within the scope of privileged communications; that is, the occasion was privileged.

The communication related to something in which the writer (Dun & Bradstreet) had an interest or duty, to one having a corresponding interest or duty, and was made in protection of that interest or in performance of the duty. Alexander v. Vann, 1920, 180 N. C. 187, 189, 104 S.E. 360; Lee v. Cannon Mills Co., 4 Cir., 1939, 107 F.2d 109, 111; Harrison v. Garrett, 1903, 132 N.C. 172, 176, 43 S.E. 594; Elmore v. Atlantic Coast Line Railroad Co., 1925, 189 N.C. 658, 668, 127 S.E. 710; Watwood v. Stone's Mercantile Agency, 1952, 90 U.S.App.D.C. 156, 194 F.2d 160, 161, 30 A.L.R.2d 772, certiorari denied 344 U.S. 821, 73 S.Ct. 18, 97 L.Ed. 639, rehearing denied 345 U.S. 960, 73 S.Ct. 935, 97 L.Ed. 1380; 36 Am.Jur. Mercantile Agencies, Sec. 11, p. 185; 53 C.J.S., Libel and Slander, § 119, p. 196; Prosser, Torts (2nd ed.), p. 617; Newell, Slander & Libel, 4 ed. (1924), sec. 416; Jeremiah Smith, Conditional Privilege, 1914, 14 Col.L.Rev. 187, 296.

For the disposition of this case, it is unnecessary to determine whether a false statement that a judgment had been obtained against Crawford and an order of sale passed to satisfy the judgment, would, as to a corporation, be considered actionable per se or only per quod.[9] If the latter, the complaint fail-

9. Statement that a judgment has been obtained is not libelous per se; Woodruff v. Bradstreet Co., 1889, 116 N.Y. 217, 222, 22 N.E. 354, 5 L.R.A. 555; see also, Sanders v. Edmonson, Tex.Civ.App.1900, 56 S.W. 611; Windisch-Muhlhauser Brewing Co. v. Bacon, 1899, 53 S.W. 520, 21 Ky.Law Rep. 928–929; F.R.C.P. 9

(g). Cf. Aetna Life Ins. Co. v. Mutual Benefit Health & Accident Ass'n, 8 Cir., 1936, 82 F.2d 115, 118; Mitchell v. Bradstreet Co., 1893, 116 Mo. 226, 239–242, 22 S.W. 358, 362, 20 L.R.A. 138; McKenzie v. Denver Times Publishing Co., 1893, 3 Colo.App. 554, 556–558, 34 P. 577; Broadway v. Cope, 1935, 208

ed to contain the necessary averments of special damage—the loss of designated, specified business or customers; and the proof failed to establish such loss.[10] If the report of August 19, 1953 falls within the classification of defamation per se, the evidence failed to show facts destroying the qualified privilege, particularly as no loss was shown proximately resulting from the publication. On the contrary, the evidence clearly established that Crawford sustained no loss attributable to the publication, but if anything, received a benefit.

In Badame v. Lampke, 1955, 242 N.C. 755, 756, 89 S.E.2d 466, the court announced the general rule that in case of unprivileged libel per se, the plaintiff would be entitled to recover at least nominal damages, without any specific proof of injury or damages. However, in Stevenson v. Northington, 1933, 204 N.C. 690, 694, 169 S.E. 622, a case of libel "undoubtedly actionable", the court seriously entertained the contention that the action should be dismissed because no damage had been shown, but found the point "without merit", as plaintiff had proved financial loss, and injury to her reputation and standing in the community.

This case was tried below on the theory that for plaintiff to recover it was necessary for it to show actual damages. The bulk of plaintiff's evidence was devoted to that point. Its only request for instructions on damages was that "the defendant is liable for damages caused by or resulting directly and proximately from the publication * * *" Among the issues it tendered for submission to the jury was one as to "What amount, if any, is the plaintiff entitled to recover of the defendant by way of compensatory damages?" and a similar one as to punitive damages. It took no exception to issue No. 4, propounded by the court: "What actual damages, if any, is the plaintiff entitled to recover of the defendant?"

The court's charge to the jury repeatedly referred to the necessity that the publication occasion "injury" or be of an "injurious nature."

In explaining the fourth issue, the court said:

"If the plaintiff is entitled to recover any actual damages at all it is entitled to recover such sum as will be a fair and just compensation for the injury, if any, inflicted by the defendant on the plaintiff by reason of the publication of a materially false and libelous statement which was published through the recklessness and carelessness of the defendant."

The court then devoted over one-fourth of the charge to a review of "the contentions * * * with respect to whether or not the plaintiff had been damaged," concluding:

"If you award the plaintiff *any damages at all* it is your duty to award him such as he establishes by the greater weight of the evidence that he *actually* sustained as the immediate and proximate cause flowing from and due entirely to the publication of the report * * * The defendant * * * can in no event be liable for *any damage* except that damage which immediately and proximately flowed from the publication by the defendant of a false statement." (Emphasis supplied.)

N.C. 85, 88–89, 179 S.E. 452; Sheppard v. Dun & Bradstreet, D.C.N.Y.1947, 71 F. Supp. 942; Kitograd v. Shapiro, City Ct. 1943, 39 N.Y.S.2d 959, 961; De Seversky v. P. & S. Publishing Co., Sup.1942, 34 N.Y.S.2d 284, 285; Wayne Works v. Hicks Body Co., 1944, 115 Ind.App. 10, 19, 55 N.E.2d 382. See also A.L.I. Restatement, Torts, secs. 561(1), 573, comment c.

10. Bowman Remedy Co. v. Jensen Salsbery Laboratories, 8 Cir., 1926, 17 F.2d 255, 259–262, 52 A.L.R. 1187; Fowler v. Curtis Publishing Co., 1950, 86 U.S.App.D.C. 349, 182 F.2d 377, 379; Odgers on Libel & Slander, 5 ed., 383.

The plaintiff took no exceptions, and requested no other or different instructions. (F.R.C.P. 51). Not one word appears in the record on nominal damages or damages from the mere false publication of the report. On appeal, the plaintiff devoted only one page of its brief to this point, and of course gave no record citations that would support consideration of it on appeal.

This background is of great significance in the disposition of the points that follow.

■■■■ The availability of the defense of qualified privilege may, of course, be lost if the statement on such occasion is made with actual malice (as distinguished from legal malice, inferred merely from the falsity of the publication). Such actual malice, whether in connection with publication on a privileged occasion, or as a foundation for punitive damages, has been variously defined, although all definitions in substance come down to the equivalent of "bad faith." For instance, actual malice has been defined as "any indirect and wicked motive"; an act done "maliciously or for no good purpose"; an act "governed by a bad motive" (Stevenson v. Northington, 1933, 204 N.C. 690, 694, 169 S.E. 622, 624); injury "inflicted in a malicious, wanton, and reckless manner"; conduct "actually malicious or wanton, displaying a spirt of mischief toward the plaintiff, or reckless and criminal indifference to his rights * * *" (Broadway v. Cope, 1935, 208 N.C. 85, 89, 90, 179 S.E. 452, 455); a "wrongful, indirect, and ulterior motive" (Gattis v. Kilgo, 1901, 128 N.C. 402, 407, 38 S.E. 931, 933); " 'General malice is wickedness, a disposition to do wrong, a "black and diabolical heart, regardless of social duty, and fatally bent on mischief." * * * ' ". (Elmore v. Atlantic Coast Line Railroad Co., 1925, 189 N.C. 658, 668, 127 S.E. 710, 715); "fraud, malice, gross negligence, insult * * *;" "willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights". (Baker v. Winslow, 1922, 184 N.C. 1, 5, 113 S.E. 570, 572). And in Montgomery Ward & Co. v. Watson, 4 Cir., 1932, 55 F.2d 184, at page 188 (a case from West Virginia), this court said:

"In the case of a privileged communication, however, express malice as distinguished from malice in law must be shown; that is to say, if the occasion be privileged, the plaintiff may not recover, although he proves that defendant used language actionable per se, and that same was false, unless he goes further and shows that in using same defendant was moved by actual malice, such as ill will, spite, grudge, or some ulterior motive."

The trial court accordingly correctly instructed the jury as to the meaning of actual malice when he said:

"Actual malice means ill will, spite or vengeance, bad motives."

He then continued immediately:

"There is no real direct evidence here that the defendant Dun & Bradstreet had any ill will toward the plaintiff. On the contrary the evidence on the part of each witness who has testified is to the effect that there had been no difference of any kind between Dun & Bradstreet and the plaintiff and there is no evidence that any of these persons who had contact with the plaintiff had any personal ill will or evil design or intent on their part to do any injury to the plaintiff; but even if there was no actual malice as I have defined it there to you in the sense that there was no personal ill will, if you should find from this evidence and by its greater weight that the defendant published a materially false and libelous statement concerning the * * * plaintiff, and did it in a reckless and heedless manner so as to exhibit a wanton disregard of the plaintiff's rights then you can consider that

on the question of whether or not that evidence is of such a nature as to satisfy you by its greater weight that this report was published with malice on the part of the defendant."

■ It would seem that under the court's finding and peremptory instruction that there was no evidence of actual malice, it should have directed a verdict for the defendant.

"In a case of qualified privilege, the burden is on the plaintiff to prove both the falsity of the charge and *that it was made with express malice.*" (Emphasis supplied.) Newberry v. Willis, 1928, 195 N.C. 302, 303, 142 S.E. 10; Byrd v. Hudson, 1893, 113 N.C. 203, 18 S.E. 209; Ramsey v. Cheek, 1891, 109 N.C. 270, 274, 13 S.E. 775.

"Proof that the words are false is not sufficient evidence of malice, unless there is evidence that the defendant knew at the time of using them, that they were false * * * That the defendant was mistaken in the charges made by him on such confidential or privileged occasion is, taken alone, no evidence of malice * * *." Ramsey v. Cheek, 1891, 109 N.C. 270, 275, 13 S.E. 775, 776; Yancey v. Gillespie, 1955, 242 N.C. 227, 230, 87 S.E.2d 210; Fields v. Bynum, 1911, 156 N.C. 413, 418, 72 S.E. 449.

"* * * If the court decides that the publication is conditionally privileged, then it is a matter of law for the court to determine whether there is any intrinsic or extrinsic evidence of malice * * *" (Citing Odgers on Libel & Slander, 279.)[11]

"'When the Judge rules that the occasion was privileged then at the close of the plaintiff's case, there being no evidence of malice either on the face of the libel itself or extrinsically, it is the duty of the Judge to direct a nonsuit or a verdict for the defendant.'" (Citing Folkard's Starkie on Libel & Slander, sec. 674.)

Gattis v. Kilgo, 1901, 128 N.C. 402, 411, 38 S.E. 931.

"It is perfectly clear to us that if, in all cases of privileged communications, the words of the published matter are to be submitted to the jury for their consideration as evidence of malice, then the privileged occasion would be no protection whatever." Gattis v. Kilgo, supra, 128 N.C. at page 412, 38 S.E. at page 935.

But the court did submit the issue of actual malice to the jury, which answered in the negative. A fortiori, the case should then have been withdrawn from the jury.

In point is Fields v. Page Trust Co., 1928, 195 N.C. 304, 142 S.E. 7. In an action for libel, it was claimed that the defendant had returned a check negotiated by the plaintiff, with the endorsed notation "signature forged." On issues submitted to them, the jury found (1) that defendant had caused the notation in question to be endorsed; (2) that the notation amounted to a charge that plaintiff had forged the check, or uttered it knowing it to have been forged; (3) that such charge was false; (4) that defendant had acted "in good faith in placing said notation on the check"; and (5) that plaintiff sustained $150 damages.

The trial judge entered a verdict for the defendant, notwithstanding the verdict. This was approved in a four line opinion:

"Judgment was correctly entered for the defendant. The occasion

---

11. In the Sixth Edition, 1929, of Odgers, p. 248, it is stated:
"* * * If the evidence adduced is equally consistent with either the existence or non-existence of malice, the Judge should stop the case; for there is nothing to rebut the presumption which has arisen in favour of the defendant from the privileged occasion. *Mere inadvertence or forgetfulness, or casual blundering, is no evidence of malice; nor is negligence or want of sound judgment, or honest indignation* * * *" (Emphasis supplied.)

having been a qualifiedly privileged one, and the jury having found that the defendant acted in good faith, the answer to the fifth issue was properly disregarded."

Defendant urged in the court below, and in this court, that negligence in the transmission of an incorrect report destroys the defense of privilege.[12] Substantially the only case[13] cited in support of this position is Douglass v. Daisley, 1 Cir., 1902, 114 F. 628, 57 L. R.A. 475. In that case, the defendant[14] (Dun & Bradstreet) had received from a correspondent a report that the plaintiff had made an assignment to secure the endorser of a promissory note. The Boston office of defendant reported this to subscribers as an assignment for the benefit of creditors. The court held that if by the exercise of ordinary care the mistake could have been avoided, "the privilege would fail." The acceptance of the construction of the opinion urged by Crawford presents several difficulties:

(1) The court emphasized that the error occurred in the transmitting office, rather than in the field—in the collection of the information. If the rule of negligence is to be applied, we see no reason to distinguish between points of origin or occurrence.[15]

(2) It is difficult to pinpoint the court's concept of negligence. It says that if the erroneous publication "was a pure mistake, involving no negligence or culpability, the privilege would not fail"; "whether the variance resulted from an excusable mistake, or from indifference or heedlessness" would be determinative. (114 F. at page 634).

■ Defendant in the Daisley case had received a report on a general assignment form. The body of the report clearly disclosed the nature of the assignment. The continuance of the privilege was said to turn upon "whether reasonable care required the home office to read the whole paper and gather all the information that it contained, and whether it was reasonable to act upon the general appearance of the assignment form, and send the information which it did. If it was carelessness, the privilege was lost. If it was a mistake which could not have been avoided by the exercise of reasonable

---

12. Crawford's brief states its position to be that the report "was not a qualifiedly privileged communication." We understand this to mean that although the communication was upon a privileged occasion, the privilege was lost through negligence.

13. Support for the contention that a defendant should be liable for damages from a false publication, negligently made, can be found in the following (none of which has been cited by Crawford): Jeremiah Smith, Conditional Privilege for Mercantile Agencies, 1914, 14 Col.L.Rev. 187, 296; Hallen, Conditional Privilege in Defamation, 1931, 25 Illinois L.Rev. 865; A.L.I. Restatement, Torts, sec. 595, comment g; Prosser, Torts, 2d ed., 628–9. As pointed out in our discussion of the Daisley case, we are unwilling, in view of the North Carolina decisions, the basis on which this case was tried below, and the conclusive nature of the evidence that the August 19, 1953 publication did not damage Crawford, to treat "negligence" as the equivalent of "actual malice" or "bad faith."

Whether negligent language may give rise to a negligence action, as distinguished from one in libel or slander for defamation (Jeremiah Smith, Liability for Negligent Language, 1900, 14 Harv. L.Rev. 184, 198–9; Prosser, Torts, 2d ed., 760–769; cf., A.L.I. Restatement, Torts, Sec. 311, Caveat) need not be determined here; for in any negligence action it is necessary that damage shall proximately result from the negligent breach of duty. Here we find no causal connection between the publication and the subsequent acts detailed in the evidence; and no damage resulting to Crawford.

14. The defendants in the lower court were described as Dun, et al; in the Court of Appeals, Douglass appears in the caption, but in the text the defendant is described as Dun & Bradstreet.

15. See Cullum v. Dun & Bradstreet, Inc., 1955, 228 S.C. 384, 90 S.E.2d 370, 372, where the court held that privilege was not lost by the publication of an erroneous report prepared by a "part-time * * * 'fee correspondent.'"

care, privilege and immunity were not lost." (114 F. 635). We do not regard this as furnishing a rule safely to be substituted for the requirement that actual malice or a bad motive must be shown to destroy the defense of privilege.

(3) The language of the court, and the disposition of the case on remand, clearly indicate that although the publication be libelous per se, the plaintiff could recover only upon, and to the extent of, proof of actual damages. The court of appeals twice referred (114 F. at pages 634, 635), to the question of whether or not the publication was "injurious." In holding that recovery could be had for "immediate diminution of business and loss of credit" the court approved instructions which had "confined the jury to such injury by way of diminution of business and loss of credit as they should find from the general facts and the whole situation was caused by the publication." (114 F. at page 638). The court pointed out that no question had been raised as to the sufficiency of the proofs of damage, and stated that the general rule as to compensation for injury "was given to the jury with a limitation in general terms that, in order to recover for diminution, the injury suffered must have resulted directly from the wrongful publication * * * must have been the natural consequence of the injurious publication, or such as naturally and proximately resulted * * *". (114

F. at page 638). In conclusion, the court stated that in view of the instructions as to damages (as to which no exceptions were taken) the jury were warranted "to determine what part, if any, of the loss was attributable to the publication." (114 F. at pages 638–639).

On remand, Daisley v. Douglass, C.C.1902, 119 F. 485, 486, the trial court referred to the "much stronger" case made by the defendant in the second trial. "The defendant has now introduced witnesses who show that all, or nearly all, parties who were subscribers to the defendant's reports to whom the libel was published, did not withdraw credit after the publication. He has met in that way, not with absolute certainty, but with as much certainty as is possible in a court of law, the suggestion that the jury might be justified in going into this unexplored field * * *". (119 F. 486).

The trial court therefore limited the recovery to the "diminution of the plaintiff's net profits arising out of the proved loss of business", and ordered a remittitur of the excess, or a new trial.

■■■■ The only other citation by Crawford in support of the contention that defendant's publication had lost its privileged status is Harrison v. Garrett, 1903, 132 N.C. 172, 43 S.E. 594,[16] holding that for the privilege to

---

16. See also Lewis v. Carr, 1919, 178 N.C. 578, 101 S.E. 97, 98, where the court held that making a charge of embezzlement where the defendants "knew, or should have known, that the charge was false" (178 N.C. 580, 101 S.E. 97), constituted sufficient evidence of malice to go to the jury. Although "should have known" may "almost inadvertently add negligence as a test" (Hallen, Conditional Privilege in Defamation, 1930, 25 Illinois L.Rev. 865, 868), the facts more nearly approached deliberate refusal to examine readily available information, than any question of mere negligence.

The parties have proceeded both in the court below and in this court on the implied assumption that North Carolina law was controlling on all points. The August 19, 1953 report was received by Century in Hartford, Connecticut. The law of Connecticut would not assist Crawford on the question of liability, since that jurisdiction holds that "good faith" is sufficient on privileged occasions; that it is not necessary that the defendant have "good reasons" or "reasonable grounds" for his good faith belief; and that where the words are published on a privileged occasion, the presumption is that the defendant honestly believed them to be true and made them

exist, there must be an honest belief in the truth of the statement. Such requirement may fully be accepted; but it is quite different from saying that every negligent act is committed in bad faith. The presumption is that a publication on a privileged occasion is made bona fide; and proof of falsity is not sufficient to establish malice.

"The presumption in favor of the defendant arising from the privileged occasion remains till it is rebutted by evidence of malice * * *." Elmore v. Atlantic Coast Line Railroad Co., 1925, 189 N.C. 658, 669, 127 S.E. 710; Yancey v. Gillespie, 1955, 242 N.C. 227, 230, 87 S.E.2d 210; Fields v. Bynum, 1911, 156 N.C. 413, 72 S.E. 449; Ramsey v. Cheek, 1891, 109 N.C. 270, 13 S.E. 775.

No contention is made that defendant knew the publication to be false. No evidence was offered to rebut the presumption of good faith.

■ In this case, the trial court expressly found that there was no actual malice. The jury expressly so found on an issue directed to that very point. In view of the North Carolina authorities above cited, requiring actual malice to destroy privilege, and defining malice in terms of bad motive, we are unable to find that negligence is the equivalent of, or may be substituted for, actual malice under the circumstances of this case.[17]

We therefore hold that the district court, under the circumstances of this case, should have directed a verdict for Dun & Bradstreet on the ground that the publication of August 19, 1953, was upon a privileged occasion, and that the privilege had not been lost.

3. *Occurrences following report of August 19, 1953.*

■ The Dun & Bradstreet report of August 19, 1953 was received by Century, surety on the Griffin and Bear contracts, on August 24, 1953. Century immediately called its local office and had its local attorney, Gay, begin an investigation. The attorney did not at that time see, and had not to the time of the trial seen, a copy of the Dun & Bradstreet report. He immediately examined the Alamance County court records and then got in touch with the attorney for Standard from whom he learned the full details of the events leading up to the suit by Standard against Crawford on the promissory note and the claim and delivery proceedings. He persuaded Standard to withhold delivery of the proceedings to the Sheriff of Forsyth County pending further investigation.

Within the next day or two Gay discussed the entire situation with Bear and Griffin, and although his company was not on the Harriss & Covington bond, he also had a conference with that company. On August 25, he saw Crawford, Sr., and received a general statement from him of Crawford's condition, which was later supplemented by a detailed financial statement.

Harriss & Covington was not a subscriber to Dun & Bradstreet service, had not received a copy of the report, and did not know about it until Gay's conference. Harriss & Covington then communicated with U. S. F. & G., sure-

---

in good faith. Ely v. Mason, 1921, 97 Conn. 38, 44, 45, 115 A. 479.

On the question of multiple publications see Mattox v. News Syndicate Co., 2 Cir., 1949, 176 F.2d 897, 901, 12 A.L.R. 2d 988, certiorari denied 1949, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525; Estill v. Hearst Publishing Co., 7 Cir., 1951, 186 F.2d 1017, 1021; cf. Hartmann v. Time, Inc., 3 Cir., 1948, 166 F.2d 127, 1 A.L.R.2d 370, certiorari denied 1948, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763; criticized 1948, 48 Col.L.Rev. 932;

1948, 61 Harv.L.Rev. 1460; 1948, 43 Ill. L.Rev. 556; 1948, 16 U. of Chi.L.Rev. 164; followed, Ettore v. Philco Television Broadcasting Corp., 3 Cir., 1956, 229 F.2d 481, 484. See, also, 1947, 60 Harv.L.Rev. 941, note: "The Choice of Law in Multistate Defamation & Invasion of Privacy: An Unsolved Problem."

17. For a flat holding that under circumstances much more appealing from the plaintiff's standpoint, negligence cannot take the place of actual malice, see

ty on its performance bond, and the adjuster of that company met with Gay. Thereafter, Gay reported to Century that because of Crawford's precarious financial condition, Century would either have to pay the two bonds or finance Crawford's operations by paying off the Standard note, advancing payrolls, and assisting in the tax situation and in forestalling action by other creditors. He had hoped that U. S. F. & G. would assume one-third of whatever costs might be involved.

Gay was able to persuade Griffin to extend the time for performance of its contract and "after much difficulty" was also able to have Bear similarly extend the time for the performance of its contract. Harriss & Covington was unwilling to extend the time for performance unless U. S. F. & G. would guarantee a future schedule of delivery of the 30 argyle machines. In view of Crawford's situation U. S. F. & G. was unwilling to undertake this obligation and on September 18, 1953, Harriss & Covington served notice of its cancellation of the contract with Crawford and demanded return of the $50,000 deposit.[18] As late as November 12, 1953, Harriss & Covington offered to take delivery of the machines upon a schedule extending from 30 to 114 days but Crawford declined to accept the offer as other arrangements had been made for the sale of machines. In fact, they were subsequently sold at higher prices.

Century paid Crawford's payrolls from the last part of August to January, 1954, and made some payments on account to creditors for a total of more than $14,000, and incurred attorney's fees and other expenses of over $10,000; agreed on September 11, 1953, to pay off the Standard note, and on September 15, 1953, paid it and took an assignment thereof. In addition Century assisted Crawford in working out plans with the tax authorities.[19]

As a result of the financing of Crawford's business by Century, the Griffin, Bear and Unique[20] contracts were completed in January or February of 1954.

Although the activities of Century permitted the performance of the contracts for the manufacture of argyle machines, which otherwise could not have been performed, and kept Crawford in business, Crawford claimed that it nevertheless was damaged by the Dun & Bradstreet report in that:

(a) Manufacturers ceased purchasing machines because of the report. No testimony of any potential customer was offered in support of this conclusion. In fact, in the Spring of 1954 Crawford turned its activities primarily to the marketing of an argyle attachment to standard knitting machines and received orders for 180 of these attachments in 1954 at prices between $1250 and $1425 per attachment.

(b) Crawford contended that its bank credit was hurt by the report. Officers of the two local banks testified that the report was not received by them and that no credit changes were made. The officers of one of these banks testified that had it received the Dun & Bradstreet report, it would not have affected the bank's credit policy but had it known the true facts with respect to the tax claims and the claim and delivery proceedings, the credit policy would have been affected. An officer of a third financial organization to which Crawford had made an inquiry as to financing testified that a decision not to finance Crawford had been made

---

Johns v. Associated Aviation Underwriters, 5 Cir., 1953, 203 F.2d 208, 212.

18. An officer of Harriss & Covington testified that the Dun & Bradstreet report had nothing to do with the refusal of Harriss & Covington to take the machines on late delivery.

19. The Collector had been threatening to seize property and to institute criminal proceedings against Crawford, Sr.

20. By mutual consent 10 machines on the Bear contract and 10 on the Unique contract were cancelled out and were sold under other arrangements.

prior to receipt of the report because of the "severe financial condition" of Crawford.

(c) Crawford claimed credit changes on the part of customers or suppliers. The evidence totally failed to support these generalizations. After this litigation was begun, Dun & Bradstreet communicated with each of the 43 subscribers to whom the report had been sent and prepared a tabulation of their dealings with Crawford. This summary was offered in evidence by *Crawford* and showed that in no instance was the report responsible for a change in policy toward Crawford. Specifically, with respect to U. S. F. & G., its local attorney testified that the action taken by his client was not "as a result of that report" which was only part of the picture and one bit "of evidence" considered by him; and Century's attorney testified that its conduct was (as the trial court found) based upon the results of its own investigation.

In short, the evidence requires the conclusion that the Dun & Bradstreet report of August 19, 1953 was not itself the cause of the intervention by the bonding companies or the source of any loss to Crawford. The report merely stimulated the bonding companies to an investigation which would have been made had Crawford, as was its obligation, reported to the bonding companies the institution of the claim and delivery proceedings. What was thereafter done was as a result of the bonding companies' appraisals of the true situation, not the situation as reported by Dun & Bradstreet. The effect of the intervention by the bonding companies permitted the continuation of Crawford's business which otherwise would have been impossible.[21]

The judgment of the district court is

Affirmed.

---

21. Accordingly, there would be no justification for a remand of this case to permit an amendment to allege damage from a false publication, negligently made. See footnote 13, supra.